See also 728 F.Supp. 1150.

**UNITED STATES of America**

v.

**Francesco GAMBINO, Appellant in No. 89–2087,**

**Ignazio Antonino Mannino, Appellant in No. 89–2088,**

**Emanuele Salvatore Mannino, Appellant in No. 89–2089,**

**Grace Pulitano Mannino, Appellant in No. 89–2090,**

**Enzo Varisco, Appellant in No. 90–1034.**

**Nos. 89–2087 to 89–2090 and 90–1034.**

United States Court of Appeals, Third Circuit.

Argued Sept. 17, 1990.

Decided March 4, 1991.

---

Joel A. Brenner (argued), East Northport, N.Y., for appellant Francesco Gambino.

Charles F. Carnesi, Brooklyn, N.Y., for appellant Ignazio Antonino Mannino.

F. Emmett Fitzpatrick, Philadelphia, Pa., for appellant Emanuele Salvatore Mannino.

John M. Apicella, Brooklyn, N.Y., for appellant Grace Pulitano Mannino.

Stanley A. Teitler (argued), New York City, for appellant Enzo Varisco.

Andrew Levchuk (argued), U.S. Dept. of Justice, Crim. Div., Appellate Section, Washington, D.C., Michael L. Seigel, Philadelphia Strike Force, Philadelphia, Pa., for appellee U.S.

Before SCIRICA, ALDISERT and HIGGINBOTHAM *, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

Defendants appeal their jury convictions of conspiracy to import and distribute heroin (21 U.S.C. §§ 963, 846) and money laundering (18 U.S.C. § 1956(a)(1)). We will affirm.

### I.

Francesco Gambino supervised the importation and distribution of heroin from Italy to the New York–New Jersey area from 1985 to 1988. The scheme was coordinated by Antonio ("Tony") Mannino and Simone Zito, with assistance from Tony Mannino's brother Salvatore ("Sal") Mannino, Tony Mannino's wife Grace Mannino, and Simone Zito's brother Stefano Zito.

Enzo Varisco was one of the conspiracy's cocaine distributors.[1]

Before addressing defendants' contentions, it is necessary to recite the facts in some detail and in particular the background and role of William Kane, an FBI informant and the government's most significant witness. Kane ran an illegal video poker business in New York City with Giuseppe "Joe" Gambino, and operated out of the Cafe Giardino in Brooklyn, owned by Joe Gambino. Through his illegal business, Kane became involved with the defendants in this case.

In October 1986, however, Kane became a confidential informant for the FBI. In 1986 and 1987, Kane was introduced to Simone Zito and Tony Mannino, and later to Simone Zito's brother, Stefano Zito. Stefano Zito and Kane became friends. In 1987, Stefano told Kane that he, his brother Simone Zito, and Tony Mannino were members of the Mafia and that they were importing heroin into the United States. Stefano told Kane that Tony's brother Sal Mannino was then in Sicily, arranging for an exchange of heroin for cocaine. FBI interceptions of telephone conversations confirmed that Sal Mannino was in Sicily at the time.

Working with the FBI, Kane began to participate in the conspirators' illegal activities. Because neither Simone nor Stefano Zito had any legitimate source of income, Kane carried them on the payroll of his video game company and arranged financing for their automobiles. Kane soon moved on to more direct involvement in the conspiracy.

In October, 1987, Simone Zito told Kane that he wanted to purchase a townhouse, as an investment and as a place to cut heroin, but that all his money was tied up in heroin. After first discussing a possible loan, Simone agreed, in a tape-recorded conversation, to sell Kane seven ounces of heroin for $25,000. That conversation also

---

\* Since the date of argument Judge Higginbotham has assumed senior status.

1. Francesco Gambino, Tony Mannino, Sal Mannino, and Grace Mannino were convicted of conspiring to import and distribute heroin (21 U.S.C. §§ 963, 846), Sal and Grace Mannino were convicted of money laundering (18 U.S.C. § 1956(a)(1)), and Enzo Varisco was convicted of conspiring to distribute cocaine (21 U.S.C. § 846).

revealed some of the details of Simone Zito's relationship with Tony Mannino. Kane mentioned that he did not want anyone to know about the transaction, not even Tony Mannino. Zito responded that "me and Tony's the same person."

Simone Zito delivered the heroin to Kane later that evening. The next day, Kane paid Simone Zito the $25,000. Tony Mannino accompanied Zito to that meeting, and afterwards Kane, Mannino and Zito discussed further heroin sales. In the course of these discussions, Kane mentioned that his boss in the drug trade was Joe Gambino. Mannino responded that his and Simone Zito's boss in the drug trade was Francesco Gambino.

On several other occasions, Simone Zito and Kane discussed further heroin transactions both in recorded and unrecorded conversations. In March or April 1988, the two had a conversation in the Cafe Giardino which significantly corroborated Mannino's earlier statement that he and Simone Zito worked for Francesco Gambino. Zito offered to sell Kane a kilogram of heroin on the spot. Kane, who was not able to purchase drugs without FBI authorization but did not want to seem disinterested, countered with a much lower offer. At that point, Simone Zito walked to the rear of the cafe, out of Kane's sight, then returned with the information that the price was negotiable, and that Kane could take a sample home to New Jersey. Shortly afterward, Kane determined that the only two people in the cafe, other than himself and Simone Zito, were Francesco Gambino and a bartender.

The government also presented evidence of the workings of the heroin importation scheme. Several members of the conspiracy who were indicted with defendants pled guilty and testified for the government. Salvatore Allegra testified that in 1985, he was asked by Tommaso Scalici to hire couriers to smuggle heroin into the United States. Supervised by Simone Zito, Allegra arranged for couriers who travelled to the United States from Sicily with packages of heroin hidden on their bodies. In the Unit-

ed States, the heroin was delivered to Salvatore Caruso, an associate of Francesco Gambino. Allegra oversaw several deliveries before he was arrested by Italian authorities in 1986.

Tony Mannino and Simone Zito also sought Kane's assistance in their cocaine distribution scheme. Salvatore Rina, a friend of Kane's who lived in Florida, had access to large amounts of cocaine. Mannino and Zito wanted Kane's help in obtaining cocaine from Rina.[2]

Timothy Zepp, another FBI informant, also testified about the conspiracy's involvement in the cocaine trade. According to Zepp, Zito sold cocaine to Enzo Varisco. Zepp was one of Varisco's customers. On one occasion, Zepp arrived at Varisco's pizzeria to pick up a cocaine delivery. Because the cocaine had not yet arrived, Varisco told Zepp to wait. Soon Simone Zito arrived, carrying a bag. After Simone and Varisco went briefly to a back room, Varisco handed Zepp his cocaine. In a later conversation with Zepp, Simone Zito revealed that he knew the price Varisco charged for the cocaine, and offered Zepp a better price.

Grace Mannino, Tony Mannino's wife, was also involved. Because Tony Mannino knew that his telephone was being tapped, the conspirators devised an elaborate system of arranging for calls to and from various public pay telephones to conduct their drug trade. Typically a conspirator would call Grace Mannino and arrange for a telephone call to the "attorney's office" at a particular time. At the specified time, Simone Zito or Tony Mannino would be observed by government agents picking up a pay telephone.

Many of the telephone calls by conspirators to the Mannino residence were in halting, guarded code. For example, on January 5, 1988, Grace Mannino told Giovanni Angelo Mannino, Tony Mannino's brother, to call her husband Tony "at the same place as two days ago." Later that day, Simone Zito called the Mannino residence and told Sal Mannino to "call your brother

---

**2.** The record does not reveal whether this contemplated transaction ever took place.

... not at that place where you went two days ago ... the one before ... be careful at what you are doing." Calls that were not so cryptic explained when Tony Mannino would arrive in Brooklyn for his frequent meetings with Francesco Gambino.

The conspirators laundered their proceeds. In 1987, Tony Mannino, Sal Mannino, Grace Mannino, and Simone Zito purchased a house to shelter their drug profits. As we have noted, in October, 1987, Simone Zito told Kane that he needed money to buy a townhouse both as an investment and as a place to cut heroin. The day after Kane delivered the $25,000 to Simone Zito and Tony Mannino, $16,000 in cash was deposited in the bank account of SNT corporation, the corporate name of a pizzeria owned and operated by the Manninos. Like the money that Kane handed Simone, the deposit contained a large number of one hundred dollar bills. The government presented evidence at trial suggesting that the remaining $9,000 was paid into the account over the next several weeks.

Two other incidents corroborate Francesco Gambino's role in the conspiracy. As we have noted, Kane helped Stefano and Simone Zito obtain automobiles. Kane made these arrangements through Robert Reyers, who was an automobile dealer in southern New Jersey. Through these transactions, Reyers became familiar with Stefano and Simone Zito, Tony Mannino, and Enzo Varisco. Reyers testified as a witness for the government at trial. In January, 1988, Robert Reyers told Kane, Simone Zito and Tony Mannino that Reyers' wife, a court reporter in the federal courthouse in Philadelphia, could obtain names that came before a federal grand jury sitting in the Eastern District of Pennsylvania. Soon afterwards, Simone Zito gave Reyers a list of four names, with instructions to contact him immediately if any of the names came up in connection with the grand jury. Those names were Simone Zito, Tony Mannino, Domenico Mannino, and Francesco Gambino.

The second incident was recounted by Simone Ricupa, a former heroin dealer in New York City. One day in 1985, Ricupa was told by his supplier, Sal DiMaggio, that DiMaggio's supplier needed as much money as possible to send to Italy as soon as possible. Ricupa gathered about $100,-000 from some of his dealers, placed it in a paper bag and, as instructed, delivered the money to DiMaggio's restaurant. When he arrived at the restaurant, Ricupa saw Francesco Gambino sitting in a car parked near the restaurant. Ricupa and DiMaggio went into the restaurant and DiMaggio went to an apartment upstairs. While waiting, Ricupa could see Gambino from his vantage point in the restaurant. DiMaggio returned downstairs with two large shopping bags, which he carried out to Gambino's car. After a quick discussion with Gambino, DiMaggio placed the bags in the car, and Gambino drove away.

On July 26, 1988, the FBI searched an apartment in Brooklyn, New York that was rented in the name of Salvatore Inzerillo. Prior to this search, Inzerillo, Simone Zito, and Tony Mannino had been seen going to and from the apartment. The search turned up a sample quantity of heroin and approximately $12,000 in cash. Reyers testified that after the search, Simone Zito said that if the search had taken place a day later "they would have caught us with four kilos of heroin."

As we have noted, following trial, Francesco Gambino, Tony Mannino, Sal Mannino, and Grace Mannino were convicted of conspiring to import and distribute heroin, Sal and Grace Mannino were convicted of money laundering, and Enzo Varisco was convicted of conspiring to distribute cocaine. The townhouse was forfeited to the United States government pursuant to 21 U.S.C. § 853.[3]

All of the defendants appeal on various grounds. For the reasons discussed below, we will affirm the district court.

3. Francesco Gambino was sentenced to thirty years' imprisonment, Tony Mannino, 27 years' imprisonment, Sal Mannino, 18 years' imprisonment, Enzo Varisco, 15 years' imprisonment, and Grace Mannino, one year and one day in prison.

## II. Co-conspirator Hearsay

█ Kane's recounting of Tony Mannino's assertion that he and Simone Zito worked for Francesco Gambino was one of the most compelling pieces of evidence offered against Gambino. Federal Rule of Evidence 801(d)(2)(E) exempts from the hearsay rule "a statement by a coconspirator of a party during the course of and in furtherance of the conspiracy." In determining whether the co-conspirator exception applies in a particular case, the trial court must determine, by a preponderance of the evidence, that there was a conspiracy between the declarant and the party against whom the evidence is offered; and that the hearsay statements sought to be admitted were made during the course of the conspiracy and in furtherance of its goals. *Bourjaily v. United States,* 483 U.S. 171, 175–76, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987). Gambino contends that there was insufficient evidence of his participation in the conspiracy, and also that the hearsay statement should not have been admitted subject to later connection.

### A.

Specifically, Gambino alleges that it was error for the district court to admit the hearsay statements prior to determining their admissibility. We begin with the observation that "the control of the order of proof at trial is a matter committed to the discretion of the trial judge." *United States v. Continental Group, Inc.,* 603 F.2d 444, 456 (3d Cir.1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980); *see also United States v. Ammar,* 714 F.2d 238, 245–47 (3d Cir.) (upholding admission of co-conspirator statements subject to later connection), *cert. denied,* 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983); *In re Fine Paper Antitrust Litigation,* 685 F.2d 810, 820–21 (3d Cir.1982)

(holding that *Continental Group* permitted, but did not require, admission of co-conspirators' hearsay statements subject to later connection), *cert. denied,* 459 U.S. 1156, 103 S.Ct. 801, 74 L.Ed.2d 1003 (1983). We review for abuse of discretion. *Ammar,* 714 F.2d at 247.[4]

There is a danger that if hearsay statements of an alleged co-conspirator are admitted subject to later connection, the court may determine at the close of evidence that the offering party did not meet its burden of establishing a conspiracy and the jury would be irremediably prejudiced. Therefore we have counseled that the practice of admitting co-conspirator hearsay statements subject to later connection "be carefully considered and sparingly utilized by the district courts." *Continental Group,* 603 F.2d at 457.

At the same time, we have consistently recognized that "the order-of-proof problem confronting the trial judge is a particularly difficult one where the government is attempting to prove the participation of multiple defendants in a continuing conspiracy." *Id.* at 456 (quoting *United States v. American Radiator & Standard Sanitary Corp.,* 433 F.2d 174, 195 (3d Cir.1970) (upholding the district court's decision to admit co-conspirator statements subject to later connection)). In *Continental Group,* we upheld the district court's decision to admit co-conspirator hearsay subject to later connection because "given the large amount of interrelated testimony to be considered in this case, we believe that alternative approaches may have been unduly complex and confusing to the jury or to the court." *Id.* at 457. Similar difficulties confront the trial judge in many large-scale conspiracy cases.

█ This case is no exception. The government's proof consisted of a large amount of interrelated testimony. Except

---

**4.** We have not been able to find in the record a timely objection. Gambino did not object when the challenged statement was elicited from Kane at trial. On appeal, Gambino asserts that he objected to the statement in several pretrial motions, and provides three citations to the record. We have examined his citations, but none of the cited materials raise this objection.

Gambino also asserts that the defendants repeatedly requested findings on the admissibility of co-conspirator statements during trial, but offers no record citations. Therefore we could review this, and the other challenges to the admission of Kane's statement that he worked for Gambino, under a plain error standard.

for Kane, most of the government's witnesses testified only to discrete corners of the conspiracy. Only Kane provided a common thread linking virtually all the conspiracy's actions. Therefore the conspiracy became clearly defined only after the testimony of several witnesses. For these reasons, we find that the district court's decision to admit the testimony subject to later connection was not an abuse of discretion.

### B.

■ Gambino also contends that timing aside, the government did not adequately establish his connection to the conspiracy. As we have noted, the trial court must determine, by a preponderance of the evidence, whether the defendant and the declarant were members of the alleged conspiracy, and whether the hearsay statements were made during the course of the conspiracy and in furtherance of its goals. *Bourjaily,* 483 U.S. at 175–76, 107 S.Ct. at 2778–79 (1987). Before the adoption of Fed.R.Evid. 104(a), proof of a conspiracy required evidence external to the hearsay statement itself. This rule was premised on the belief that a statement should not be able to "lift itself by its own bootstraps to

the level of competent evidence." *Glasser v. United States,* 315 U.S. 60, 75, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942). *Bourjaily* made clear, however, that the adoption of Fed.R.Evid. 104(a) changed the earlier rule, and that the co-conspirator's hearsay statement could be used to establish the existence of a conspiracy.

■ In *Bourjaily,* the Court expressly declined to decide whether a trial court could rely "solely upon [the declarant's] hearsay statements to determine that a conspiracy had been established by a preponderance of the evidence." *Bourjaily,* 483 U.S. at 181, 107 S.Ct. at 2781. Here there is sufficient evidence external to the hearsay statement itself, so we need not address that issue today.[5]

■ The district court assumed a need for some external evidence, and found that Gambino was a member of the conspiracy, and that the hearsay statement to Kane was made during the course of and in furtherance of that conspiracy. We review the district court's determination under a clearly erroneous standard. *United States v. Cruz,* 910 F.2d 1072, 1081 n. 11 (3d

5. We note that every United States court of appeals that has addressed this issue has required some independent evidence. The pre-*Bourjaily* requirement of proof *aliunde* was premised on the presumptive unreliability of co-conspirator hearsay. *See* 483 U.S. at 179, 107 S.Ct. at 2780. Davenport, *The Confrontation Clause and the Co–Conspirator Exception in Criminal Prosecutions: A Functional Analysis,* 85 Harv.L.Rev. 1378, 1387 (1972) (coconspirator statements may suffer from "exclusively self-serving motives and possibly faulty memories"); Levie, *Hearsay and Conspiracy: A Reexamination of the Co–Conspirators' Exception to the Hearsay Rule,* 52 Mich.L.Rev. 1159, 1165–66 (1954) ("The conspirator's interest is likely to lie in misleading the listener into believing the conspiracy stronger with more members (and different members) and other aims than in fact it has.").

The Court did not alter that presumption, but held that the ways in which it could be rebutted had been expanded by the adoption of Fed.R. Evid. 104(a). "[A] piece of evidence, unreliable in isolation, may become quite probative *when corroborated by other evidence....* [T]rial courts must be permitted to evaluate these statements for their evidentiary worth as revealed by

the particular circumstances of the case." 483 U.S. at 180, 107 S.Ct. at 2781 (emphasis added). In the absence of any evidence to the contrary, however, the presumption of unreliability controls; and the hearsay statement cannot serve as the basis for establishing the declarant's connection to the conspiracy. *United States v. Garbett,* 867 F.2d 1132, 1134 (8th Cir.1989) ("It is generally agreed that 'an otherwise inadmissible hearsay statement cannot provide the sole evidentiary support for its own admissibility.' ") (quoting *Bourjaily,* 483 U.S. at 184, 107 S.Ct. at 2783 (Stevens, J., concurring)); *United States v. Silverman,* 861 F.2d 571, 577 (9th Cir.1988) ("[A] co-conspirator's out-of-court statement, standing alone, is insufficient to establish that the defendant had knowledge of and participated in a particular conspiracy."); *United States v. Gordon,* 844 F.2d 1397, 1402 (9th Cir.1988) ("[T]here must be some evidence, aside from the proffered statements, of the existence of the conspiracy and the defendant's involvement."); *United States v. Zambrana,* 841 F.2d 1320, 1344–45 (7th Cir.1988) (observing that some independent evidence is necessary); *United States v. Daly,* 842 F.2d 1380, 1386 (2d Cir.) (assuming that some independent evidence is necessary), *cert. denied,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988).

Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 709, 112 L.Ed.2d 698 (1991).

■ The following independent evidence indicates that Gambino was involved in the conspiracy to import and distribute narcotics. First, there is the March, 1988 discussion in the Cafe Giardino between Kane and Simone Zito. After some bickering about the price of heroin, Simone Zito left for another area of the cafe, and upon returning Zito told Kane that the price was negotiable, and that he could have a sample of the heroin. Shortly thereafter, Kane observed that Francesco Gambino and a bartender were the only other people in the cafe. It was a permissible inference that Zito went to Gambino for authority to negotiate price.

Francesco Gambino was also strongly implicated through the compromise of confidential grand jury proceedings. Simone Zito provided Reyers with a list of four names, and asked Kane to inform him if any of the names were mentioned in grand jury proceedings. Gambino's name was on that list, along with the names of Simone Zito, Tony Mannino, and fugitive codefendant Domenico Mannino. It was a permissible inference that these individuals were linked in the drug trade.

Filippo Ricupa's testimony also tied Gambino to the conspiracy. In the 1985 money drop described in Part I, Gambino was in a car in front of the restaurant, and received the bags that DiMaggio brought downstairs. Furthermore, electronic surveillance revealed regular telephone calls between Gambino and Tony and Grace Mannino, many of which involved when Tony Mannino would arrive in Brooklyn for his frequent meetings with Gambino. When viewed in light of the other evidence they corroborate Gambino's involvement.

Finally, a series of FBI surveillance photographs showed Gambino in the presence of many of the co-conspirators, in particular Tony Mannino and Simone Zito, during "key periods of the conspiracy." *United States v. Gambino*, 728 F.Supp. 1150, 1155 (E.D.Pa.1989). Mere association "cannot alone support a conviction for conspiracy. *United States v. Torres*, 519 F.2d 723, 725–26 (2d Cir.), *cert. denied*, 423 U.S. 1019, 96 S.Ct. 457, 46 L.Ed.2d 392 (1975). On the other hand, the timing and circumstances of a meeting or series of meetings may be sufficiently suspicious to permit a reasonable inference of complicity in the criminal enterprise." *United States v. Ammar*, 714 F.2d 238, 250 (3d Cir.1983). In *Ammar*, we held that evidence of repeated meetings with other members of the conspiracy coinciding with heroin importations appropriately could be considered in determining whether the co-conspirator exception to the hearsay rule was applicable. Here, also, consideration of the photographs was appropriate.

To this evidence we now add the hearsay statement sought to be admitted. According to Kane, Tony Mannino directly asserted to Kane that Gambino was Mannino's and Zito's boss in the drug trade. The district court, which heard the testimony, concluded that all of this evidence, taken together, established by a preponderance of the evidence Tony Mannino and Simone Zito's membership in a conspiracy with Gambino. This determination was not clearly erroneous.

### III.

All of the defendants challenge the admission and use of several witnesses' guilty pleas.

### A.

■ At trial, the government presented several witnesses who were co-conspirators and who had pled guilty. While on the stand, the government elicited testimony about their guilty pleas. Defendants contend that these references to the co-conspirators' guilt were prejudicial and deprived them of a fair trial.

Defendants did not object during the witnesses' testimony. Therefore, we review this matter under a plain error standard. *See* Fed.R.Evid. 103(a)(1) (requiring a "timely objection ... stating the specific ground of objection, if the specific ground was not apparent from the context"); *United States v. Pungitore*, 910 F.2d 1084,

1125–26 (3d Cir.1990) (reviewing for plain error statements to which defendants did not object), *petition for cert. filed*, Dec. 6, 1990 (No. 90–6472).[6] Under the plain error standard (Fed.R.Crim.P. 52(b)), we can correct " 'only particularly egregious errors, those errors that seriously affect the fairness, integrity or public reputation of judicial proceedings.' " *United States v. Thame*, 846 F.2d 200, 204 (3d Cir.) (quoting *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)), *cert. denied*, 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 333 (1988).

There are strong considerations against using a co-conspirator's guilt as substantive evidence of another defendant's guilt. "The foundation of [this] policy is the right of every defendant to stand or fall with the proof of the charge made against him, not against somebody else.... The defendant ha[s] a right to have his guilt or innocence determined by the evidence presented against him, not by what has happened with regard to a criminal prosecution against someone else." *Bisaccia v. Attorney General of New Jersey*, 623 F.2d 307, 312 (3d Cir.) (quoting *United States v. Toner*, 173 F.2d 140, 142 (3d Cir.1949)), *cert. denied*, 449 U.S. 1042, 101 S.Ct. 622, 66 L.Ed.2d 504 (1980). In *Bisaccia*, a *habeas corpus* proceeding, we held that a prosecutor's use of a co-conspirator's guilty plea to establish another defendant's guilt was error, and remanded for a determination of whether the error was harmless.

This specter is not implicated when a guilty plea is introduced not to establish a co-conspirator's guilt, but for some valid purpose. For example, in *United States v. Inadi*, 790 F.2d 383, 384 n. 2 (3d Cir.1986), we upheld the admission of a co-conspirator's guilty plea "in order to rebut defense counsel's persistent attempts on cross-examination to raise an inference that the co-conspirators had not been prosecuted,

and that Inadi was being singled out for prosecution."

■ In any criminal trial, the credibility of the prosecution's witnesses is central. By eliciting the witness' guilty plea on direct examination, the government dampens attacks on credibility, and forecloses any suggestion that it was concealing evidence. Such disclosure is appropriate. *See United States v. Casto*, 889 F.2d 562, 567 (5th Cir.1989) ("Because it was reasonable for the prosecution here to believe that [defendant's] counsel would attempt to impeach [a testifying co-conspirator's] implicating testimony by questioning her about her guilty plea, it was also reasonable for the prosecutor to adduce this fact during her opening examination of [the testifying co-conspirator]."), *cert. denied*, —— U.S. ——, 110 S.Ct. 1164, 107 L.Ed.2d 1067 (1990); *United States v. Dworken*, 855 F.2d 12, 30 (1st Cir.1988) ("[T]he fact of [a] guilty plea and the plea agreement properly may be elicited to dampen the effect of an anticipated attack on the witness' credibility."); *United States v. Louis*, 814 F.2d 852, 856 (2d Cir.1987) ("Proper purposes [for co-conspirators' guilty pleas] include disclosure of matters damaging to the credibility of a witness and contradiction of any inference that the government is concealing a witness' bias."); *see also* 2 J. Weinstein & M. Berger, *Evidence* ¶ 410[07], at n. 3 (1990) (If a co-offender who appears as a witness has pled guilty, "the trier must know about the plea's existence in order to evaluate the witness' testimony."). In this case, the defendants began their attack on the credibility of the government's witnesses in their opening statements to the jury. Yet even in the absence of this attack, the elicited testimony was proper here.

■ At the same time, it is important that the jury understand the limited purposes of a co-conspirator's guilty plea. Here, in its final charge, the district court properly instructed the jury that the guilt

6. Some of the testimony was objected to on other grounds. For example, defendants objected to the admission of Zepp's guilty plea on the ground that Zepp's discussion of the plea agreement included a reference to the protection the government was providing him. That did not preserve the objection that is currently before us. *See, e.g., United States v. Field*, 875 F.2d 130, 134 (7th Cir.1989) ("Neither a general objection to the evidence nor a specific objection on other grounds will preserve [an] issue on review.").

of any one person was not substantive evidence of the guilt of any other person. We also note that the guilty pleas were not emphasized by the prosecutor during direct examination, and were not inappropriately emphasized during closing argument. We believe that the appropriate uses of the pleas were clear. The references to the pleas were not an abuse of discretion, let alone plain error.

### B.

Defendants level a special attack on the testimony of Robert Reyers. He started the trial as a defendant but pled guilty on the twelfth of twenty-six days of trial and became a witness for the prosecution. During the government's case in chief, Reyers corroborated some of Kane's testimony through his own recollection of events, and also testified that Kane had told him about many of the incidents Kane mentioned at trial.

 Defendants timely objected to Reyers' testimony on the grounds that it would impermissibly suggest the guilt of the remaining defendants. We review the district court's decision to admit Reyers' testimony for abuse of discretion. *See United States v. Pungitore*, 910 F.2d 1084, 1151 (3d Cir.1990), *petition for cert. filed*, Dec. 6, 1990 (No. 90–6472).[7]

 As we have noted, guilty pleas are properly elicited on direct examination to dampen subsequent attacks on credibility, and to foreclose any suggestion that the party producing the witness was concealing evidence. That conclusion applies equally to Reyers' testimony. Reyers' relationships with the remaining defendants could have created the possibility for the prejudice that we warned of in *Bisaccia*. Here, the district court avoided those dangers.

As we have noted, the district court properly instructed the jury on the appropriate uses of guilty pleas, and as with the guilty pleas of the other co-conspirators, Reyers' guilty plea was not emphasized by the prosecutor during direct examination, and was not inappropriately emphasized during closing argument. We believe that the appropriate uses of Reyers' plea were clear, and that the district court's decision to admit Reyers' testimony and to allow mention of his guilty plea was not an abuse of discretion.

This case is factually similar to *United States v. Kilrain*, 566 F.2d 979 (5th Cir. 1978), *cert. denied*, 439 U.S. 819, 99 S.Ct. 80, 58 L.Ed.2d 109 (1978). In that case, one of the defendants pled guilty in the middle of trial and became a government witness. The remaining defendants, who were convicted, contended that the defendant who pled guilty had been privy to their defense strategy, and therefore they were deprived of a fair trial. The Court of Appeals for the Fifth Circuit upheld the convictions, observing that the remaining defendants needed to demonstrate some "actual prejudice resulting from [the witness'] supposed knowledge of defense strategy, or that [the witness] communicated such knowledge to the government." 566 F.2d at 983. In this case, defendants have not alleged any specific prejudice. Although the Sixth Amendment claim raised in *Kilrain* is different than the claim raised here, *Kilrain* lends support to our result today.

### C.

Defendants also object to remarks made by the prosecution during closing arguments. Before discussing the challenged remarks, we must place them in context. A central focus of defendants' closing ar-

---

**7.** Defendants raise two further objections to Reyers' testimony. First, they contend that the district court should have declared a mistrial even before the jury was apprised of Reyers' plea during his testimony, because the mere fact of his disappearance strongly implied his guilt, and in turn implicated the other defendants. Any such inference was foreclosed by the court's clear instruction to the jurors, immediately after they entered the courtroom on the first day following Reyers' plea, that they were not to infer anything from Reyers' absence. At that point in the trial, we find no prejudice to the other defendants. Second, defendants contend that Reyers' testimony impermissibly bolstered Kane's credibility as a witness, because the jury might infer that Kane's testimony was one of the reasons Reyers pled guilty. We deal with this objection below.

guments—indeed much of their defense at trial—was Kane's lack of credibility. Counsel for Tony Mannino argued that "William Kane, as [the prosecution] knew before they put him on the stand, is a perjurer. Simple. He's got a history of it.... He told you he's a gangster, he's a wiseguy, he's a thug who goes around threatening people with a gun.... You decide: murderer or liar? Either way, his testimony isn't worth anything. William Kane is a cold, calculating individual who came here and lied even as we sat...."

Even more telling, counsel for defendant Fodera, who was acquitted by the jury, pointedly made an issue of Reyers' lack of belief in Kane. In his closing argument, he remarked:

> This case is unique in the trials of criminal cases in that this is one of the rare instances that you will ever see where you will see one of the government witnesses get on the stand and say to you, as happened in this case, that another one is a liar and a perjurer. Do you remember Reyers, the fellow who used to sit in that corner over there, who pled guilty and became a government witness? Reyers testified in connection with this case, and Reyers, one of the things that he said is that Kane, when he testified in this court, lied. So, you have one witness characterizing another government witness as a perjurer.

The reference is to testimony by Reyers, elicited during cross-examination, recalling a conversation that Reyers had with Gambino's attorney before Reyers pled guilty. Reyers had told Gambino's attorney that he believed that Kane was lying on the stand. Later in his closing, counsel for Fodera again sounded this refrain:

> And Mr. Reyers, who was one of [the prosecution's] witnesses ... said [Kane] lied on the witness stand and he was a liar, and I accuse [Kane] of being a murderer and I accuse him of being a perjurer, and I submit to you that it is not fair, it is not just, to try to convict [Fodera] solely on the testimony of a murderer, a perjurer, a robber, a burglar, a career criminal.

After these remarks, the prosecution, in its rebuttal remarks to the jury, suggested that Reyers' guilty plea belied his asserted lack of faith in the veracity of Kane's testimony.

> Now [Counsel for Tony Mannino], in talking about William Kane, told you what a liar he was, and other attorneys have. But remember this: Reyers and Joseph Cuffaro thought that he was such a liar that, based on his evidence against them, they pled guilty.... You heard Mr. Cuffaro testify that, as the result of the sale of 15 kilograms of cocaine in Florida, he was indicted, and the sale was to Bill Kane. He was indicted and he pled guilty. And you heard Mr. Reyers, that he pled guilty, and you heard during the course of this trial that the evidence against Mr. Reyers came primarily from William Kane.

■ Defendants timely objected to the prosecution's statements, and now contend that the reference to Reyers' and Cuffaro's guilty pleas deprived them of a fair trial. We review the district court's denial of a motion for a mistrial on these grounds for abuse of discretion. *See United States v. DiLoreto*, 888 F.2d 996 (3d Cir.1989). We will reverse if "the prosecutor's remarks, taken in context of the trial as a whole, were sufficiently prejudicial to have deprived [defendants of their] right to a fair trial." *United States v. DiPasquale*, 740 F.2d 1282, 1297 (3d Cir.1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985).

■ Defendants raise two related arguments. First, they contend that the fact of Reyers' and Cuffaro's guilty pleas cannot appropriately be used to bolster Kane's credibility by suggesting that they, at least, believed Kane. Second, they argue that even if the prior guilty pleas are relevant, mentioning them warrants a mistrial because it suggests that the remaining defendants are guilty merely by virtue of their association with those who pled guilty.

At the outset, we note that the comments by the prosecutor were proper as a fair and invited response to the defendants' vehe-

ment attacks on Kane's credibility. "[P]rosecutorial comment must be examined in context." *United States v. Robinson*, 485 U.S. 25, 33, 108 S.Ct. 864, 869, 99 L.Ed.2d 23 (1988). In *Robinson*, defendant's attorney had argued that the government had unfairly deprived his client, who did not testify at trial, of an opportunity to explain his actions. In his closing argument, the prosecutor commented that the defendant had the opportunity to take the stand and testify if he so desired. Defendant claimed that this reference deprived him of his right to be free from compulsory self-incrimination under the Fifth Amendment and under 18 U.S.C. § 3481 (1988). The Court rejected this claim, reasoning that the comments were a fair response to defendant's attacks. Similarly, in *United States v. Pungitore*, 910 F.2d 1084, 1120–27 (3d Cir.1990), *petition for cert. filed*, Dec. 6, 1990 (No. 90–6472), we held that a prosecutor's summation reference to his oath of office was a proper response to a closing argument attack on the integrity of the prosecution that ranged beyond any evidence adduced at trial. *See also United States v. Arnold*, 890 F.2d 825, 830 (6th Cir.1989) (prosecutor's mention of codefendants' guilty pleas in closing argument appropriate rehabilitation of a witness' credibility); *United States ex rel. Paxos v. Rundle*, 491 F.2d 447, 453 (3d Cir.1974) (" 'counsel does have the right to reply to an argument raised by his opposing advocate' ") (quoting *United States v. Casteel*, 476 F.2d 152, 155 (10th Cir.1973)).

The reference to Reyers' guilty plea was appropriate as a direct response to a specific argument made by the defense. *See United States v. Sanchez*, 790 F.2d 1561 (11th Cir.1986). In *Sanchez*, defendant was convicted of money laundering. He was involved in several transactions with an investment firm established by the DEA for the purpose of investigating the laundering of drug proceeds. Defendant attacked, on cross-examination, one of the prosecution witness' "suitability for federal investigative work." 790 F.2d at 1564. The Court of Appeals for the Eleventh Circuit upheld the admission of testimony by a DEA agent that the witness had been

found reliable in other investigations, because the testimony was a direct response to the defendant's attack. *See also* Fed.R. Evid. 608; McCormick, *Evidence* § 49 (3d ed. 1984).

We note that at least one other United States Court of Appeals has found guilty pleas relevant and admissible evidence of a witness' veracity when invoked as a direct response to a specific attack. In *United States v. Martinez*, 775 F.2d 31, 36–38 (2d Cir.1985), much of the prosecution's case turned on the testimony of one witness, who like the defendant was an inmate in a state prison. The defendant pointed out that the witness had accused other inmates and guards of committing crimes, suggesting that the witness had fabricated these accusations to curry favor with the prison administration and to procure an early release. The prosecution rejoined with testimony establishing that all of the guards accused by the witness had pled guilty. The Court of Appeals for the Second Circuit approved, holding that admission of these other guilty pleas was not an abuse of discretion. *Id.* at 38. *Cf. United States v. Lochmondy*, 890 F.2d 817, 820–22 (6th Cir.1989) (upholding a conviction when the government had, during closing, observed that one of the prosecution's witnesses had testified in other cases that resulted in convictions); *Arnold*, 890 F.2d at 830.

In this case, defendants made an issue of Reyers' belief in Kane in closing arguments. The reference to Reyers' plea on rebuttal was an appropriate response. Defendants never specifically made an issue of Cuffaro's belief in Kane, so we find the reference to Cuffaro's plea more troubling. Even if we were to find that this was error, however, it would be harmless, because Cuffaro did not play a central role in either the conspiracy or the government's case at trial. In contrast, the issue of Kane's credibility was constantly revisited, by all parties, throughout the twenty-six day trial. Cuffaro's guilty plea was in an unrelated proceeding, and the role Kane's testimony played in that plea was, and remains, unclear. The one reference to Cuffaro's plea was not, when "taken in

context of the trial as a whole, sufficiently prejudicial to have deprived [defendants of their] right to a fair trial." *United States v. DiPasquale*, 740 F.2d 1282, 1297 (3d Cir.1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985).

 It is significant that the challenged statements left undisturbed the jury's prerogative to decide all questions of credibility. If there was any ambiguity, it was cleared up in the district court's instructions, in its final charge, that evaluating the credibility of witnesses was the function of the jury. *Cf. United States v. Hilton*, 772 F.2d 783, 786 (11th Cir.1985) ("When bolstering testimony suggests to the jury that a witness bears the responsibility for determining the truth of the evidence, admission of the testimony may constitute reversible error.") (citing *United States v. Price*, 722 F.2d 88, 90 (5th Cir. 1983)); *United States v. Murray*, 445 F.2d 1171, 1176 n. 7 (3d Cir.1971); *United States v. DiLoreto*, 888 F.2d 996, 999 (3d Cir.1989) (prosecutorial vouching for the credibility of a witness improper).

Even if otherwise appropriate, the challenged references to guilty pleas could still constitute reversible error if used as substantive evidence of the defendants' guilt. As we have noted, such use poses the threat that a defendant will be found guilty not on the basis of evidence against him, but on the basis of a shadow cast by cases against others. *Bisaccia v. Attorney General of New Jersey*, 623 F.2d 307, 312–13 (3d Cir.) (quoting *United States v. Toner*, 173 F.2d 140, 142 (3d Cir.1949)), *cert. denied*, 449 U.S. 1042, 101 S.Ct. 622, 66 L.Ed.2d 504 (1980). Therefore we must determine whether the appropriate use of the references was sufficiently clear.

As we have noted, there was a direct nexus between Reyers' plea and the attacks on Kane's credibility. This nexus made clear that the pleas were not offered as substantive evidence of the defendants' guilt. Cuffaro's plea, also, was mentioned in response to attacks on Kane's credibility. The connection to Kane's credibility was far less direct, and therefore the purpose less clear. As we have mentioned, how-

ever, he was not centrally involved in the conspiracy in this case. His guilty plea was entered in a different proceeding, and when he described his plea to the jury he mentioned only that he had purchased cocaine from Kane, and did not mention any of the defendants. Recalling this testimony in closing argument did not imply that any of the defendants were guilty of the offenses charged in this case. Finally, any possible misunderstanding of the appropriate use of the guilty pleas was cleared up by the district court's jury instructions. The court explicitly told the jury that the guilt of any person was not evidence of any other person's guilt. Defendants did not object to this charge. We view this as adequate, because under Fed.R.Crim.P. 30, "[i]f a more specific curative instruction were thought necessary, counsel should have requested one before the jury retired." *United States v. Thame*, 846 F.2d 200, 204 (3d Cir.), *cert. denied*, 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 333 (1988).

For these reasons, the prosecutor's remarks did not deprive defendants of a fair trial, and the district court's denial of defendants' motion for a mistrial on this ground was not an abuse of discretion.

## IV.

Defendants raise several other grounds for appeal. First, they challenge the sufficiency of the evidence supporting their convictions and the forfeiture of the house. We have reviewed the record, and find those arguments without merit. *See Burks v. United States*, 437 U.S. 1, 16, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1 (1978); *United States v. Pungitore*, 910 F.2d 1084, 1128–29 (3d Cir.1990), *petition for cert. filed*, Dec. 6, 1990 (No. 90–6472).

Defendants also claim that the district court improperly admitted Kane's hearsay testimony recounting matters about the conspiracy told him by Stefano Zito. Those statements were admitted under the co-conspirator exception we have already discussed. Defendants contend there was insufficient evidence establishing Stefano Zito's membership in the conspiracy; and that the statements were not in further-

ance of the conspiracy. We disagree, and find those contentions without merit.

Defendants raise several other claims. They contend that: the district court's instructions to the jury were flawed; the prosecutors created or altered certain critical documents; the prosecutors improperly referred to charges pending against Simone Zito and Tony Mannino in Italy during trial; defendants were prejudiced by the handing down of a superseding indictment six weeks prior to trial; the government failed adequately to minimize intercepted communications; the jury had available during its deliberations prejudicial tapes that had not been admitted into evidence; and the district court erroneously failed to quash a superseding indictment or order the government to provide a bill of particulars. We have considered each of these arguments and find them without merit.

For the foregoing reasons, we will affirm the judgments of sentence.