USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 93-1313 UNITED STATES OF AMERICA, Appellee, v. DARRELL F. PIERRO, Defendant, Appellant. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Douglas P. Woodlock, U.S. District Judge] ___________________ _________________________ Before Selya, Circuit Judge, _____________ Campbell, Senior Circuit Judge, ____________________ and Lagueux,* District Judge. ______________ _________________________ Elliot M. Weinstein, for appellant. ___________________ Michael K. Loucks, Assistant United States Attorney, with __________________ whom Donald K. Stern, United States Attorney, was on brief, for _______________ the United States. _________________________ July 27, 1994 _________________________ __________ *Of the District of Rhode Island, sitting by designation. SELYA, Circuit Judge. Defendant-appellant Darrell F. SELYA, Circuit Judge. _____________ Pierro labors to convince us that the district court erred in refusing to grant him a separate trial, in refusing to declare a mistrial, and, following his conviction, in refusing to reduce his sentence beneath the suggested guideline range. We are not persuaded by appellant's exhortations and, therefore, affirm. I. BACKGROUND I. BACKGROUND At the times material hereto, appellant earned his livelihood as a vice-president of the Moore Group (MoGro), a California company. Yielding to temptation, he also joined a criminal cartel that, during the years 1989 and 1990, engaged in the theft and subsequent resale of computer components manufactured by and for Digital Equipment Corporation (DEC). This scheme functioned on three levels. The initial step involved the thefts a step in which appellant at first did not participate. The second step involved the sale of the stolen equipment; with appellant's connivance, his employer, MoGro, purchased much of the contraband.1 The third step involved the purchasers' disposal of the bootleg merchandise. For its part, MoGro, under appellant's aegis, handled this third phase in two ways. It returned some components to DEC, after altering their serial numbers, as part of an established exchange program, thus converting stolen, often ____________________ 1The thieves stole computer components from DEC's warehouse in Massachusetts both during the week and on weekends. The components purchased by MoGro comprised, for the most part, the bounty from the weekend heists. The remaining contraband was sold mainly to a codefendant, Fred Kleinerman. 2 unusable components into new, state-of-the-art equipment. It resold the rest of the components on credit terms to a Wisconsin firm, and then pledged the invoices as security for bank loans. MoGro used the loan proceeds, inter alia, to pay the thieves for _____ ____ the stolen merchandise. From and after late 1989, appellant assumed an active role in the looting of DEC's warehouse. On several occasions, he and fellow MoGro employees (including John McComas) flew from California to Massachusetts and assisted in the unlawful asportation of computer components. These purloined parts subsequently were shipped to MoGro's California headquarters and disposed of by one of the two methods we have described. In early 1990, appellant and several confederates were spotted inside DEC's warehouse, fled, and were eventually apprehended. Subsequently, a federal grand jury returned a 158- count indictment against 16 persons. It charged appellant with conspiracy to participate in a racketeering enterprise, see 18 ___ U.S.C. 1962(d), participating in a racketeering enterprise, see ___ id. 1962(c), and money laundering, see id. 1956(a)(1). The ___ ___ ___ predicate acts upon which the RICO charges rested included both money laundering and interstate transportation of stolen property, see 18 U.S.C. 2314. ___ In response to a clutch of severance motions, including one filed to appellant's behoof, the district court split the defendants into two groups for purposes of trial. The court's order called for appellant and seven other alleged coconspirators 3 (including McComas, Kleinerman, and Ruslan Moore, MoGro's president) to be tried together, but apart from the other eight defendants. On September 8, 1992, trial commenced for most members of appellant's group.2 During the trial, the court denied appellant's renewed severance motion and his motion for a mistrial. The jury found appellant guilty on all counts. The court sentenced him to serve 121 months in prison. This appeal followed. II. THE ALLEGED TRIAL ERRORS II. THE ALLEGED TRIAL ERRORS Appellant contends that the district court erred in denying his renewed motion for severance and his motion to declare a mistrial. We examine each of these contentions. A. The Severance Motion. A. The Severance Motion. ____________________ We need not linger long over the question of severance. "As a rule, persons who are indicted together should be tried together." United States v. O'Bryant, 998 F.2d 21, 25 (1st Cir. _____________ ________ 1993). We have said that to overcome this presumption a properly joined defendant and, clearly, joinder was proper here, see ___ Fed. R. Crim. P. 8(b) must muster "a strong showing of evident prejudice." O'Bryant, 998 F.2d at 25. When the term is used in ________ this context, "prejudice means more than just a better chance of acquittal at a separate trial." United States v. Boylan, 898 _____________ ______ F.2d 230, 246 (1st Cir.) (citation omitted), cert. denied, 498 _____ ______ U.S. 849 (1990). Indeed, the Supreme Court has been blunter ____________________ 2One of the eight defendants originally included in this cadre pled guilty prior to trial. 4 still, stating that when multiple defendants are named in a single indictment, separate trials should not be ordered unless "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 113 S. Ct. 933, 938 (1993). ______ _____________ On appeal, Pierro does not challenge the district court's pretrial order segmenting the defendants into two groups for purposes of trial. However, he complains bitterly about the district court's refusal to grant his mid-trial motion for severance a device by which he sought to put some distance between himself and Kleinerman. The motion rested on twin rationales: first, Kleinerman's testimony about a litany of "bad acts" which had nothing to do with appellant; second, Kleinerman's courtroom antics, which, appellant alleges, reflected adversely on all the defendants. We bifurcate this complaint, considering these grounds separately. 1. Spillover. The first aspect of appellant's 1. Spillover. _________ argument amounts to a claim of spillover prejudice. To prevail on such a claim, a defendant must prove prejudice so pervasive that a miscarriage of justice looms. See United States v. ___ ______________ Sabatino, 943 F.2d 94, 96-97 (1st Cir. 1991); Boylan, 898 F.2d at ________ ______ 246. We have carefully reviewed the record and discern no prejudice to appellant above and beyond the quantum of prejudice that typifies virtually any multi-defendant trial and that sort of prejudice clearly does not justify a severance. See United ___ ______ 5 States v. Walker, 706 F.2d 28, 30 (1st Cir. 1983). ______ ______ To be sure, Kleinerman testified about a bogus burglary he staged at his home and about telling another witness that she should have dissembled when appearing before the grand jury. This testimony, like other bits and pieces of evidence about which appellant complains, while unsavory, was not in any way antagonistic to appellant's defense. And nothing implicated appellant in the peccadilloes; to the contrary, the evidence suggested he was on the other side of the continent both when Kleinerman faked the break-in and when Kleinerman attempted to suborn perjury. Since it is settled that properly joined defendants need not be severed merely because a joint trial will require that the jury receive testimony even a large amount of testimony irrelevant to one defendant, see Boylan, 898 F.2d at ___ ______ 246, we are not at liberty to second-guess the district court's denial of appellant's motion, see id. ___ ___ Although perhaps supererogatory in light of the foregoing, we also take note of the trial court's exemplary handling of the situation. The court carefully controlled the presentation of the proof, making the jury keenly aware that certain evidence was limited to particular defendants, and that, in all events, the evidence had to be considered separately against each defendant. In the first instance, a reviewing court must presume that the jury heeded these prophylactic instructions. See United States v. Olano, 113 S. Ct. 1770, 1781 ___ _____________ _____ (1993); United States v. Paiva, 892 F.2d 148, 160 (1st Cir. ______________ _____ 6 1989). Here, there is no basis to suppose that the jurors disregarded the trial judge's admonitions and departed on a frolic of their own. 2. Kleinerman's Behavior. Appellant also assigns 2. Kleinerman's Behavior. ______________________ error to the district court's denial of a severance based on what he calls Kleinerman's "cheerleading" during the trial testimony of various witnesses. The conduct that appellant attributes to Kleinerman mostly gestures and grimaces obviously occurred; indeed, the district judge found Kleinerman in contempt for his courtroom antics. If, during the course of a multi-defendant criminal trial, a defendant misbehaves in the jury's presence, the misbehavior usually will not compel a separate trial for his codefendants. See, e.g., United States v. Rocha, 916 F.2d 219, ___ ____ _____________ _____ 230 (5th Cir.), cert. denied, 500 U.S. 934 (1991); United States _____ ______ _____________ v. Tashjian, 660 F.2d 829, 837-38 (1st Cir.), cert. denied, 454 ________ _____ ______ U.S. 1102 (1981). Unless a movant can demonstrate the existence of some special prejudice of a kind or to a degree not susceptible to remediation by prompt curative instructions, the district court is free to eschew a severance and let the trial proceed. Applying this standard, we do not think that Kleinerman's pantomime, regrettable though it was, required the nisi prius court to grant a severance. In our view, this ____ _____ situation parallels but is much less noxious than other situations in which courts have concluded that well-chosen, well- 7 timed curative instructions will satisfactorily ameliorate the adverse effects of a defendant's inappropriate behavior on his codefendants.3 See, e.g., Rocha, 916 F.2d at 230; Tashjian, 660 ___ ____ _____ ________ F.2d at 838; United States v. Smith, 578 F.2d 1227, 1236 (8th _____________ _____ Cir. 1978); United States v. Marshall, 458 F.2d 446, 452 (2d Cir. _____________ ________ 1972); cf. United States v. Mazza, 792 F.2d 1210, 1224-25 (1st ___ _____________ _____ Cir. 1986) (finding no unfair prejudice to codefendants arising out of a defendant's disruptive behavior even though a curative instruction was neither requested nor given), cert. denied, 479 _____ ______ U.S. 1086 (1987). So it is here: there was no cognizable prejudice present.4 3. Recapitulation. Trial courts are afforded 3. Recapitulation. ______________ considerable leeway in determining severance questions. See ___ O'Bryant, 998 F.2d at 25; Boylan, 898 F.2d at 246. Consequently, ________ ______ a judge's resolution of such questions "will be overturned only if that wide discretion is plainly abused." United States v. _____________ Natanel, 938 F.2d 302, 308 (1st Cir. 1991), cert. denied, 112 S. _______ _____ ______ Ct. 986 (1992). We see no vestige of any abuse in this instance. ____________________ 3Kleinerman's misbehavior did not plummet to the depths reached in Rocha, 916 F.2d at 229 (a case in which a defendant _____ mouthed a death threat and then ran a finger menacingly across his throat during a witness's testimony), or in Tashjian, 660 ________ F.2d at 837 (a case in which a defendant gestured, mouthed words to the effect that a government witness would receive five bullets in the head, and shouted that all the defendants were "in the Mafia"). 4There is, moreover, an added fillip in this case that further erodes appellant's position: his assumption that the jury must have been aware of Kleinerman's antics is sheer speculation. Kleinerman's gestures were nonverbal, and the judge did not comment on them in the jury's presence. 8 B. The Motion for a Mistrial. B. The Motion for a Mistrial. _________________________ After 18 days of trial, the government negotiated a plea agreement with McComas and, after McComas pled guilty, called him as a prosecution witness. Appellant immediately moved in limine to bar McComas from testifying. The district court __ ______ denied that motion. Appellant subsequently moved for a mistrial, arguing that McComas's abrupt change of plea, followed by potentially incriminating testimony, would be unfairly prejudicial. The district court refused to grant the requested relief. Appellant assigns error. Motions to declare mistrials are directed primarily to the district court's discretion, see United States v. Sepulveda, ___ _____________ _________ 15 F.3d 1161, 1185 (1st Cir. 1993), cert. denied, ___ S. Ct. ___ _____ ______ (1994); United States v. De Jongh, 937 F.2d 1, 3 (1st Cir. 1991); _____________ ________ and, accordingly, an appellate tribunal ought not to interfere with the disposition of such a motion unless the complaining party can demonstrate a manifest abuse of that discretion. Bearing in mind the trial judge's superior point of vantage, this precept possesses particular force when, as now, a motion for mistrial is based on a claim that some spontaneous development at trial may have influenced the jury in an improper manner. Of course, this does not mean that appellate courts should reflexively rubber-stamp the trier's refusal to declare a mistrial. But because mistrials are strong medicine, disruptive not only to the parties but also to the judiciary's efforts to manage crowded dockets, it is only rarely and in extremely 9 compelling circumstances that an appellate panel, informed by a cold record, will venture to reverse a trial judge's on-the-spot decision that the interests of justice do not require aborting an ongoing trial. See Real v. Hogan, 828 F.2d 58, 62 (1st Cir. ___ ____ _____ 1987); see also Sepulveda, 15 F.3d at 1184. Hence, battles over ___ ____ _________ the need for a mistrial most often will be won or lost in the district court. As a general matter, a mistrial is not automatically required when a codefendant changes his plea in mid-trial. See, ___ e.g., United States v. Del Carmen Ramirez, 823 F.2d 1, 3 (1st ____ ______________ __________________ Cir. 1987); United States v. Earley, 482 F.2d 53, 58 (10th Cir.), _____________ ______ cert. denied, 414 U.S. 1111 (1973). That principle obtains even _____ ______ when the newly pleaded defendant takes the witness stand and testifies against the remaining defendants. See United States v. ___ _____________ Gambino, 926 F.2d 1355, 1364 (3d Cir.), cert. denied, 501 U.S. _______ _____ ______ 1206 & 112 S. Ct. 415 (1991); see also United States v. Kilrain, ___ ____ ______________ _______ 566 F.2d 979, 982-83 (5th Cir.), cert. denied, 439 U.S. 819 _____ ______ (1978). In such a situation, the court ordinarily can proceed with the trial after appropriately instructing the jury concerning the change of plea and the newly proffered testimony. See Gambino, 926 F.2d at 1364. It is only when some special ___ _______ circumstance creates unfair prejudice, not realistically curable by appropriate instructions, that the court must declare a mistrial.5 See id.; see also Kilrain, 566 F.2d at 983. ___ ___ ___ ____ _______ ____________________ 5We recognize that when a codefendant switches sides and becomes a government witness, his testimony will likely help the government and harm the remaining defendants. Indeed, this is 10 Appellant asserts that this case evades the usual rule because special circumstances exist. He points to the fact that the three "MoGro defendants" appellant, McComas, and Moore had been pursuing a common defense, and that McComas's change of plea and his ensuing testimony knocked the pins out from under this defense.6 He adds, moreover, that the deleterious side effects of Kleinerman's misbehavior, see supra Part II(A)(2), ___ _____ furnished a further basis for a mistrial. We do not believe that this jeremiad derives sufficient support from the record. The trial judge found no cognizable prejudice, and close perscrutation of the transcript fails to shake this finding. At any rate, given the highly deferential standard of review, we are not prepared to second-guess the finding based on appellant's self-interested speculation.7 ____________________ often a strong incentive to the government in the plea-bargaining process. But this sort of prejudice does not necessitate a mistrial. It is only unfair prejudice against which courts must ______ guard. See, e.g., United States v. Rodriguez-Estrada, 877 F.2d ___ ____ _____________ _________________ 153, 156 (1st Cir. 1989); United States v. Ingraham, 832 F.2d _____________ ________ 229, 233 (1st Cir. 1987), cert. denied, 486 U.S. 1009 (1988). _____ ______ 6Although three different lawyers represented the MoGro defendants, appellant asseverates that the lawyers coordinated their opening statements and their cross-examination of prosecution witnesses, and that they adopted a "unified theme" in regard to challenging the government's proof and confronting its witnesses. After McComas changed his plea, appellant alone was caught in the toils; the third MoGro defendant, Moore, found sanctuary when the district court granted his motion for judgment of acquittal, Fed. R. Crim. P. 29(a). 7There is another reason why we are particularly reluctant to override the trier's judgment call in this case. If any unfair prejudice sprouted and we stress that we have found no sign of any we believe it would have been cured by the trial judge's painstaking instructions. It strikes us as significant in this regard that appellant has criticized neither the content 11 III. THE ALLEGED SENTENCING ERROR III. THE ALLEGED SENTENCING ERROR To place appellant's final assignment of error into proper perspective, we divide this portion of our analysis into three sections. First, we rehearse the sentencing calculus.8 Second, we discuss the question of appellate jurisdiction. Third, we consider the substance of the claimed error. A. The Sentence. A. The Sentence. ____________ The district court classified the counts of convictions as comprising two groups, see U.S.S.G. 2E1.1, comment. (n.1), ___ one for interstate transportation of stolen property, see 18 ___ U.S.C. 2314, and one for money laundering, see 18 U.S.C. ___ 1956(a)(1).9 The judge determined that, under U.S.S.G. 2B1.2(a), the first group had a base offense level (BOL) of 4. The court then added 15 levels for bringing about a loss in excess of $2,500,000 (but less than $5,000,000), see U.S.S.G. ___ 2B1.1(b)(1)(P); 4 levels for engaging regularly in the business of buying and selling stolen property, see U.S.S.G. ___ ____________________ nor timeliness of these instructions. 8The district court sentenced appellant in February of 1993, using the November 1992 edition of the sentencing guidelines. See United States v. Harotunian, 920 F.2d 1040, 1041-42 (1st Cir. ___ _____________ __________ 1990) (explaining that the guidelines in effect at the time of sentencing control unless ex post facto considerations prohibit their use). Hence, all references herein are to that edition. 9Since "racketeering comes in many shapes and sizes, and covers a wide range of activities," United States v. Winter, 22 _____________ ______ F.3d 15, 19 (1st Cir. 1994), a sentencing court must look to the predicate crimes to establish the guideline sentencing range, see ___ U.S.S.G. 2E1.1(a)(2). In this case, the predicate offenses are interstate transportation of stolen property and money laundering. 12 2B1.2(b)(4)(A); and 3 levels for performing a managerial role in the offense, see U.S.S.G. 3B1.1(b). These calculations yielded ___ an adjusted offense level of 26. The judge performed a similar set of computations for the second group of convictions. He determined that this group revolved around money laundering and, therefore, used U.S.S.G. 2S1.1(a)(1) to fix the BOL at 23.10 The judge then added 7 levels because the value of the laundered funds exceeded $3,500,000, see U.S.S.G. 2S1.1(b)(2)(H), bringing the adjusted ___ offense level to 30. Since the second group produced a substantially higher adjusted offense level than the first group, the district court, following the praxis specified by the Sentencing Commission, see ___ U.S.S.G. 2E1.1(a), set the first series of computations to one side and, instead, added 2 levels to the second group's adjusted offense level, pursuant to section 3D1.4, thus bringing the final offense level to 32. This produced a guideline sentencing range (GSR) of 121-151 months for a first-time offender. The court imposed an incarcerative sentence at the bottom of the range. On appeal, Pierro concedes that these calculations are supportable, but claims that the lower court erred in not venturing a downward departure premised on "mitigating circumstances." See 18 U.S.C. 3553(b) (providing, inter alia, ___ _____ ____ for departures if the court ascertains that there exists a ____________________ 10For purposes of computing the sentencing range, it is unnecessary to distinguish between the substantive money laundering offenses and money laundering as a RICO predicate. 13 "mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described [in the GSR]"); U.S.S.G. 5K2.0 (implementing statute). The government demurs. B. Appellate Jurisdiction. B. Appellate Jurisdiction. ______________________ As a matter of first principles, an appellate court is duty bound to confirm the existence of its own jurisdiction. See ___ Juidice v. Vail, 430 U.S. 327, 331 (1977); Mansfield, Coldwater & _______ ____ ______________________ Lake Mich. Ry. Co. v. Swan, 111 U.S. 379, 382 (1884); In re Dein ___________________ ____ __________ Host, Inc., 835 F.2d 402, 404 (1st Cir. 1987). We do so here. __________ It is by now axiomatic that a criminal defendant cannot ground an appeal on a sentencing court's discretionary decision not to depart below the guideline sentencing range. See, e.g., ___ ____ United States v. Tardiff, 969 F.2d 1283, 1290 (1st Cir. 1992); ______________ _______ United States v. Amparo, 961 F.2d 288, 292 (1st Cir.), cert. ______________ ______ _____ denied, 113 S. Ct. 224 (1992); United States v. Hilton, 946 F.2d ______ _____________ ______ 955, 957 (1st Cir. 1991); United States v. Romolo, 937 F.2d 20, _____________ ______ 22 (1st Cir. 1991). This rule, however, admits of certain exceptions. One such exception applies when the sentencing court's declination to depart results from a mistake of law. See ___ Amparo, 961 F.2d at 292; Hilton, 946 F.2d at 957. Consequently, ______ ______ "appellate jurisdiction may attach if it appears that the failure to depart stemmed from the sentencing court's mistaken impression that it lacked the legal authority to deviate from the guideline range or, relatedly, from the court's misapprehension of the 14 rules governing departures." United States v. Gifford, 17 F.3d _____________ _______ 462, 473 (1st Cir. 1994). Counsel often confuse the exception and the rule. If the judge sets differential factfinding and evaluative judgments to one side, and says, in effect, "this circumstance of which you speak, even if it exists, does not constitute a legally _____________________ sufficient basis for departure," then the correctness of that quintessentially legal determination may be tested on appeal. _____ But if the judge says, in effect, either that "this circumstance of which you speak has not been shown to exist in this case," or, alternatively, that "while this circumstance of which you speak might exist and might constitute a legally cognizable basis for a departure in a theoretical sense, it does not render this particular case sufficiently unusual to warrant departing," then, in either such event, no appeal lies. We think that this case fits within the exception rather than the rule, and, hence, that we have jurisdiction to consider the assigned error. At the disposition hearing, appellant identified three possible grounds for departure, namely, (1) that his case was, in essence, a sheep in wolves' clothing a garden-variety theft-of-property case, treated by the guidelines as a money laundering case, and, therefore, well outside the heartland of the money laundering guideline; (2) that his GSR was skewed by "double counting"; and (3) that, if sentenced within the GSR, his punishment would be vastly disproportionate to his codefendants' sentences. The district 15 court rejected all three bases for departure. Read objectively, the district court seems to have said, in effect, that even if appellant could prove the subsidiary facts upon which his arguments rested that his conviction grew out of a scheme to steal property rather than a scheme to launder money, that double counting influenced the composition of the GSR, and that his coconspirators received sentences milder than the GSR in his case prophesied none of the cited circumstances would constitute a legally cognizable reason for imposing a sentence below the GSR. If the district court erred in this determination, the error was a purely legal one. Thus, appellate jurisdiction attaches. C. The Merits. C. The Merits. __________ We address separately appellant's claim that his conduct fell outside the heartland of the money laundering statute, thereby justifying a downward departure. We then proceed to examine appellant's remaining sentence-related claims. 1. The Essence of the Offense. In analyzing 1. The Essence of the Offense. ______________________________ appellant's "heartland" claim, we first step back to review the anatomy of "mitigating circumstance" departures. The method of the sentencing guidelines demands that, in the ordinary case, the judge apply the guidelines, make such interim adjustments as the facts suggest, compute a sentencing range, and then impose a sentence within that range. See 18 U.S.C. 3553(a)(b); see also ___ ___ ____ United States v. Rivera, 994 F.2d 942, 946 (1st Cir. 1993); ______________ ______ United States v. Diaz-Villafane, 874 F.2d 43, 47-48 (1st Cir.), _____________ ______________ cert. denied, 493 U.S. 862 (1989). Because departures are the _____ ______ 16 exception, rather than the rule, see Diaz-Villafane, 874 F.2d at ___ ______________ 52, "it is only in the extraordinary case the case that falls outside the heartland for the offense of conviction that the district court may abandon the guideline sentencing range and impose a sentence different from the sentence indicated by mechanical application of the guidelines." United States v. _____________ Jackson, ___ F.3d ___, ___ (1st Cir. 1994) [No. 93-1826, slip op. _______ at 4]; see also Rivera, 994 F.2d at 947-48. ___ ____ ______ When a sentencing court considers a "mitigating circumstance" departure, the relevant circumstance must be of a kind cognizable under the guidelines, see Rivera, 994 F.2d at ___ ______ 949, and must render the case "special" or "unusual," see id. ___ ___ The determination of whether a particular circumstance is sufficiently "special" or "unusual" to warrant departing presents a question of law, the determination of which is reviewed de novo __ ____ on appeal. See Jackson, ___ F.3d at ___ [slip op. at 6]; Diaz- ___ _______ _____ Villafane, 874 F.2d at 49. In this case, we do not think that _________ the relationship between the statutes underlying appellant's several convictions constitutes a mitigating circumstance upon which a departure can be predicated. We accept appellant's two subsidiary premises. First, his involvement in money laundering arose out of his use of proceeds from the sale of stolen property as security for bank loans. See 18 U.S.C. 1956(a)(1)(A) (criminalizing the conduct ___ of a financial transaction with knowledge that the property involved in the transaction represents the proceeds of specified 17 forms of illegal activity). Second, the Sentencing Commission has chosen to punish money laundering with particular severity, and the introduction of the money laundering guideline into the sentencing calculus therefore resulted in a markedly higher GSR and a longer prison term for appellant, see supra Part III(A). ___ _____ Be that as it may, we cannot accept the conclusion that appellant draws from these two premises. The money laundering statute does not exempt from its reach those persons who launder money merely in the furtherance of underlying criminal activities. Nor does the statute, in terms, suggest that such persons' actions perforce fall outside the statute's proper scope. On the contrary, the crime colloquially known as money laundering is committed whenever a person, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" nevertheless "conducts or attempts to conduct . . . a financial transaction which in fact involves [such] proceeds." 18 U.S.C. 1956(a)(1). In our view, Congress meant this statute to address, among other things, conduct undertaken subsequent to, although in connection with, an underlying crime, rather than merely affording an alternative means of punishing the underlying crime itself. See United States v. Johnson, 971 F.2d 562, 569 (10th ___ _____________ _______ Cir. 1992). Thus, our reading of the same statute recently led us to observe, in countering an argument strikingly similar to that stitched together by Pierro, that Congress "intended money laundering to be a separate crime distinct from the underlying 18 offense that generated the money." United States v. LeBlanc, ___ _____________ _______ F.3d ___, ___ (1st Cir. 1994) [No. 93-1847, slip op. at 14]. Other cases have reached essentially the same conclusion. See, ___ e.g., Johnson, 971 F.2d at 569 (stating that Congress designed ____ _______ the money laundering statute to fill a lacuna "with respect to the post-crime hiding of ill-gotten gains"); see also United ___ ____ ______ States v. Edgmon, 952 F.2d 1206, 1214 (10th Cir. 1991) (holding ______ ______ that principles of double jeopardy do not bar prosecution and punishment for both money laundering and conversion based on the same overall conduct), cert. denied, 112 S. Ct. 3037 (1992). _____ ______ There is little question that the appellant's conduct fits snugly within this framework. Appellant argues that "although the facts which formed the predicate for the convictions were within the strict linguistic parameters of the sentencing guidelines for money laundering, the defendant's actual conduct did not fall within [what the Sentencing Commission intended to punish as] money laundering . . . ." This is virtually a replica of the argument we rejected in LeBlanc, _______ ___ F.3d at ___ [slip op. at 12].11 Because appellant's ____________________ 11In LeBlanc, following convictions for, inter alia, illegal _______ _____ ____ gambling activities and money laundering, the court computed a GSR for each defendant. There, as here, the range was pushed upward by the presence of money laundering. To correct this perceived bias, the district court departed downward on the theory that the defendants' crime, at bottom, constituted bookmaking, and should be sentenced as such; the money laundering, the court thought, was merely incidental to the illegal gambling, and, therefore, the offenses of conviction, although technically including money laundering, fell outside the heartland for that crime. See LeBlanc, ___ F.3d at ___ [slip op. ___ _______ at 8]. We remanded for resentencing, ruling that the court's characterization of the defendants' conduct ignored the fact that 19 offense conduct, though arising out of his participation in interstate transportation of stolen property, comes well within the heartland of the money laundering statute and guideline, the court below correctly concluded, as a matter of law, that it could not base a downward departure on this circumstance. See ___ LeBlanc, ___ F.3d at ___ [slip op. at 16]; see also United States _______ ___ ____ _____________ v. Limberopoulos, ___ F.3d ___, ___ (1st Cir. 1994) [No. 92-1955, _____________ slip op. at 12-13] (rejecting analogous argument; holding that district court's view that defendant's conduct fell within the heartland of a regulatory statute but outside the heartland of a drug trafficking statute reflected a misunderstanding of the basic objectives of the two statutes, their interplay, and their interposition vis-a-vis the sentencing guidelines). 2. Remaining Bases for Departure. Appellant suggests 2. Remaining Bases for Departure. ______________________________ two additional ways in which the trial court appropriately could have departed downward. Neither suggestion has any merit.12 a. a. __ First, appellant contends that a downward departure could have been predicated on the fact that "double counting" ____________________ they were also guilty of money laundering, which Congress had made a distinct offense. See id. at ___ [slip op. at 16-17]. ___ ___ 12Appellant gives these points only cursory treatment in his appellate brief. We could, therefore, simply dismiss them on that ground. See Ryan v. Royal Ins. Co., 916 F.2d 731, 734 (1st ___ ____ _______________ Cir. 1990) (ruling "that issues adverted to on appeal in a perfunctory manner, unaccompanied by some developed argumentation, are deemed to have been abandoned"); United States _____________ v. Zannino, 895 F.2d 1, 17 (1st cir.) (same), cert. denied, 494 _______ _____ ______ U.S. 1082 (1990). But because the contentions were aired in detail below, we elect to address them briefly. 20 boosted his GSR to heights not contemplated by the Sentencing Commission. In this regard, appellant asserts that the same money was factored into the sentencing court's computations twice once in calculating the offense level for money laundering and once in calculating the offense level for interstate transportation of stolen property. We cannot accept this assertion. It is not at all clear that any double counting took place. As discussed above, where an underlying crime occurs antecedent to money laundering, the offenses are considered separate and distinct for sentencing purposes. This distinctiveness requires that a separate computation be made for each group of offenses. See United States v. Lombardi, 5 F.3d ___ _____________ ________ 568, 571 (1st Cir. 1993) (holding that an anomaly would result if a sentencing court were compelled to treat mail fraud and money laundering in the same sentencing category). Appellant dealt in stolen property having a value in excess of $2,500,000 and also laundered over $3,500,000 in profits garnered from the resale of stolen property. Hence, the punishment for engaging in each of these criminal activities must be calculated independently. See ___ id. ___ By the same token, each crime has its own measure of loss; the value of the property stolen from DEC and the dollar amount of ill-gotten sale proceeds used by MoGro to secure financial support may turn out to be the same, but they are arrived at differently. The mere existence of some indeterminate 21 degree of overlap between these figures does not constitute double counting. See, e.g., United States v. Lilly, 13 F.3d 15, ___ ____ _____________ _____ 18 (1st Cir. 1994) (holding that overlapping uses of same data anent monetary loss did not constitute double counting in the particular circumstances of the case). To say more would be to trespass on the reader's indulgence. Even if the situation here could be described in some useful way as comprising double counting, the phenomenon is not sufficiently "special" or "unusual" to warrant a downward departure. After all, in the sentencing context double counting is not rare and the practice is often perfectly proper. See ___ id. at 19. ___ b. b. __ The final circumstance on which appellant relies in support of a downward departure is disproportionality the comparative severity of his sentence as contrasted with the sentences to be served by other coconspirators.13 The district court believed that it lacked authority to depart on this basis. We concur. See, e.g., United States v. Wogan, 938 F.2d 1446, ___ ____ _____________ _____ 1448 (1st Cir.), (holding that "a perceived need to equalize sentencing [among codefendants] . . . will not permit a departure"), cert. denied, 112 S. Ct. 441 (1991); United States _____ ______ _____________ v. Carr, 932 F.2d 67, 73 (1st Cir.) (explaining that judicial ____ dissatisfaction with comparative outcomes cannot justify ____________________ 13As we have previously indicated, this lack of symmetry stems primarily from appellant's involvement in money laundering a circumstance that boosted his GSR well above what it would have been under the guideline covering interstate transportation of stolen property. None of the other defendants carried similar baggage into the sentencing arena. 22 departure), cert. denied, 112 S. Ct. 112 (1991). _____ ______ 3. Need for Remand. The district court sentenced 3. Need for Remand. ________________ appellant in February 1993. Approximately five months later, this court decided Rivera, 994 F.2d 942, a case that elaborated ______ the circuit's departure jurisprudence. Appellant invites us to remand so that the district court may reexamine the sentence in light of Rivera. We decline the invitation. ______ Building a body of precedent is an evolutionary process. If the mere fact that a new opinion sheds light on an area of the law automatically required appellate courts to remand for reconsideration all cases pending on direct appeal that dealt with the same area of the law, the system would become a shambles. Remand is required only when there is a realistic possibility that the new precedent, properly applied, will alter or otherwise materially affect the result reached in the trial court.14 See, e.g., Gifford, 17 F.3d at 475. Applying this ___ ____ _______ benchmark, there is no need to remand this case for resentencing. When a newly minted precedent clarifies a corner of the law while a case involving the same (or a closely related) point is pending on direct appeal, the threshold question is almost always whether the trial court's analysis would have differed in some material respect if it had had the benefit of the clarification. Here, that question demands a negative answer: ____________________ 14For purposes of this discussion, we assume that the new precedent constitutes a clarification, entitled to retroactive effect vis-a-vis cases still pending on direct appeal. Broader retroactivity concerns are beyond the proper scope of this opinion. 23 Judge Woodlock fully anticipated our opinion in Rivera, carefully ______ sifted the record to determine whether any unusual circumstances existed that might warrant a downward departure, and, discovering none, correctly abjured the desired departure. Hence, a remand would serve no useful purpose as the analytic approach would be essentially unchanged and would, therefore, produce the same conclusions. See, e.g., United States v. Smith, 14 F.3d 662, 666 ___ ____ _____________ _____ (1st Cir. 1994) (affirming district court's pre-Rivera refusal to ______ depart under Rivera standard); see also United States v. Sclamo, ______ ___ ____ _____________ ______ 997 F.2d 970, 974 (1st Cir. 1993) (affirming pre-Rivera downward ______ departure and declining to remand for reconsideration in light of Rivera). ______ We hasten to add that even when a district court has not fully anticipated an emergent clarification, a remand will not necessarily follow. For example, when the court's subsidiary findings of fact are reasonably explicit, unaffected by its legal error, and subject to reuse, a remand would be an empty exercise. See Societe des Produits Nestle v. Casa Helvetia, Inc., 982 F.2d ___ ___________________________ ___________________ 633, 642 (1st Cir. 1992). In such a situation, so long as the court of appeals can arrange the untainted findings along the proper legal matrix, it need not remand. See United States v. ___ ______________ Mora, 821 F.2d 860, 869 (1st Cir. 1987); see also Figueroa- ____ ___ ____ _________ Rodriguez v. Aquino, 863 F.2d 1037, 1041 (1st Cir. 1988). _________ ______ This principle offers an alternative basis for denying appellant's request for a remand. Even if, without the benefit of Rivera, the district court's grasp of departure jurisprudence ______ 24 proved faulty and we do not believe that to have been the case a remand would not be exigible. For all the skillful lawyering that has been mustered on appellant's behalf, he has been utterly unable to isolate any "special" or "unusual" feature of this case which, under Rivera, could support a downward departure. ______ IV. CONCLUSION IV. CONCLUSION We need go no further. For aught that appears, appellant was fairly tried, justly convicted, and appropriately sentenced. He has been unable to advance any persuasive reason either for revising the outcome or for prolonging the proceedings. The judgment below must, therefore, be Affirmed. Affirmed. ________ 25