12-4663(L)
United States v. Barret

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
_____

August Term, 2015

(Argued: January 6, 2016                    Decided: February 15, 2017)

Docket Nos. 12-4663(L), 13-3800, 14-573, 14-2014[1]

_____

UNITED STATES OF AMERICA,

*Appellee,*

v.

CHRISTOPHER BARRET, D/B/A Derrick Brown, A/K/A Sean Brown, A/K/A
Mouthy, A/K/A The General, A/K/A Chris, A/K/A Solo, OMAR MITCHELL,
A/K/A Sox, LEON SCARLETT, A/K/A Agony, A/K/A Piggy,

*Defendants-Appellants.*[2]

_____

Before: POOLER, HALL, and CARNEY, *Circuit Judges.*

_____

[1] 12-4663 was determined by an order filed on April 18, 2014.
[2] The Clerk of Court is respectfully directed to amend the caption as above.

Appeal from the judgments of the United States District Court for the Eastern District of New York (Matsumoto, *J.*) convicting Christopher Barret, Omar Mitchell, and Leon Scarlett of conspiracy to distribute and possess with intent to distribute in excess of 1,000 kilograms of marijuana. This opinion addresses two arguments raised by appellants: whether (1) the district court erred in admitting the testimony of Kareem Forrest, a former co-defendant who switched his plea to guilty and agreed midtrial to cooperate with the government, and testify against the remaining co-defendants; and (2) the quantity of marijuana attributed to Mitchell is supported by the evidence.

We join our sister Circuits in finding that the testimony of a former co-defendant who pleads guilty during trial and then agrees to testify as a government witness at that same trial is admissible so long as the district court takes steps to avoid undue prejudice to the remaining defendants. *See, e.g., United States v. Olson*, 450 F.3d 655 (7th Cir. 2006). These steps include limiting testimony to events other than the witness's involvement in joint defense planning and properly instructing the jury regarding the changed circumstances.

We also hold that the evidence adduced at trial was sufficient to permit the jury to conclude that Mitchell knowingly joined a conspiracy to distribute more

2

than 1,000 kilograms of marijuana, and that such an amount was reasonably foreseeable to him. Appellants' remaining arguments are addressed in a summary order issued simultaneously with this opinion.

Affirmed.

_____

JAMES M. BRANDEN, New York, NY, *for Defendant-Appellant Christopher Barret.*

MICHAEL H. SPORN, New York, NY, *for Defendant-Appellant Omar Mitchell.*

PETER TOMAO, Garden City, NY, *for Defendant-Appellant Leon Scarlett.*

TYLER J. SMITH, Assistant United States Attorney (Amy Busa, Peter A. Norling, Assistant United States Attorneys, *on the brief*), *for* Robert L. Capers, United States Attorney for the Eastern District of New York, New York, NY, *for Appellee.*

POOLER, *Circuit Judge*:

Appeal from the judgment of the United States District Court for the Eastern District of New York (Matsumoto, *J.*) convicting Christopher Barret, Omar Mitchell, and Leon Scarlett of conspiracy to distribute and possess with intent to distribute in excess of 1,000 kilograms of marijuana. This opinion addresses two arguments raised by appellants: whether (1) the district court

3

erred in admitting the testimony of Kareem Forrest, a former co-defendant who switched his plea to guilty and agreed midtrial to cooperate with the government, and testify against the remaining co-defendants; and (2) the quantity of marijuana attributed to Mitchell is supported by the evidence.

We join our sister Circuits in finding the testimony of a former co-defendant who pleads guilty during trial, and then agrees to testify as a government witness at that same trial, is admissible so long as the district court takes steps to avoid undue prejudice to the remaining defendants. *See, e.g., United States v. Olson*, 450 F.3d 655 (7th Cir. 2006). These steps include limiting testimony to events other than the witness's involvement in joint defense planning and properly instructing the jury regarding the changed circumstances.

We also hold that the evidence adduced at trial was sufficient to permit the jury to conclude that Mitchell knowingly joined a conspiracy to distribute more than 1,000 kilograms of marijuana, and that such an amount was reasonably foreseeable to him. Appellants' remaining arguments are addressed in a summary order issued simultaneously with this opinion.

**BACKGROUND**

**I.  The Investigation**

This case developed from a joint investigation by the United States Postal Inspection Service, the Drug Enforcement Administration ("DEA"), and the New York City and New York State Police Departments, into the activities of a large-scale marijuana distribution organization in Queens, New York known as the "Fatherless Crew." The government alleged, and as outlined below the evidence at trial demonstrated, that the Fatherless Crew acted as wholesalers for New York-based drug dealers, with the drugs shipped from suppliers in Arizona and California via the United States Postal Service. Barret headed the Fatherless Crew; Scarlett served primarily as an enforcer for Barret; and Mitchell served as a lookout who, from time to time, also sold drugs.

The Fatherless Crew is alleged to have run its operation out of the Barret residence in Jamaica, Queens, one other residential property, and several commercial mail receiving agencies ("CMRAs") located in Queens. Arizona police officers contacted the Postal Inspection Service in Arizona after observing a subject in a narcotics investigation mail three packages. The packages were set

5

aside, and a drug-sniffing dog gave positive alerts to the packages, an indication that the packages contained contraband. After making inquiries, a postal inspector determined that while the addresses on the packages were valid, the names on the packages were not the names associated with those addresses. The postal inspector obtained search warrants, opened the packages and ultimately seized 17.51 kilograms[3] of marijuana from the three packages. After the seizure of the boxes in Phoenix, investigators used mail records to track certain parcels from Arizona to several CMRAs in Flushing, New York. Investigators also conducted surveillance of the locations where the packages were delivered, including Barret's residence, which was monitored via a video camera mounted to a utility pole.

On July 27, 2010, investigators observed Mitchell walking back and forth between the front of the Barret residence and a nearby street corner, and then sitting in front of the house "for quite a period of time." Gov't App'x at 107. When a silver Chrysler arrived, Mitchell talked to the driver, and then allowed him to back the car into the driveway. A second individual removed a cardboard

---

[3] At trial, the government presented evidence of the quantities of marijuana involved in some instances in kilograms and in others, in pounds. For consistency, we provide the approximate quantity of marijuana involved in kilograms.

6

box from the vehicle and brought it into the Barret residence. The cardboard box was consistent in size and appearance with boxes later seized at the Barret residence and found to contain marijuana.

On August 26, 2010, four parcels that together weighed roughly 45 kilograms were dropped off at a post office in Arizona. The packages arrived in Flushing on August 28, 2010. On August 28, 2010, co-defendant Andre Wilson backed his Cadillac into the driveway of the Barret residence and unloaded the boxes into the house. Also that same day, three parcels that together weighed roughly 34 kilograms were dropped off at a post office in Arizona. These three parcels arrived in Flushing on August 30, 2010, and Wilson again backed his Cadillac into Barret's driveway and unloaded boxes into the house.

The pattern repeated itself multiple times throughout September: packages were tendered in Arizona to the postal service; arrived at various CMRAs in Flushing; and were delivered to the Barret residence. Altogether, during the month of September, investigators observed roughly 187 kilograms of marijuana transported in this fashion.[4]

---

[4] Government's Exhibit 517, presented at trial in conjunction with Postal Inspector James Buthorn's testimony and listing the weights of the parcels, was not provided to us as part of the record on appeal. We rely instead on the

On October 5, 2010, ten packages weighing roughly 120 kilograms were sent from Arizona to three CMRAs in Flushing. Investigators observed Wilson pick up nine of the boxes and deliver them to the Barret residence. Investigators later discovered the tenth box at another CMRA in Flushing, and seized 10.63 kilograms of marijuana from the box. In addition, on August 19, September 2, and 23, 2010, investigators conducted "trash pulls" of garbage left outside the Barret residence and discovered bags containing remnants of marijuana, plastic bags with marijuana residue and rubber bands.

On October 7, 2010, a number of individuals, including Forrest, gathered at the Barret residence. Around noon, Melbert Palmer arrived at the house with $1,500 to purchase marijuana. Barret told Palmer he didn't have the marijuana, but that the marijuana was due soon, so Palmer should wait. Barret told Scarlett, Forrest, and two other individuals to join Wilson on his trip to pick up marijuana from the CMRAs. Palmer testified that he heard Barret tell Forrest to get two guns and to give one to Scarlett and one to another individual. Investigators observed Wilson and the others leaving to go to the CMRAs to pick up boxes,

---

government's presentation of the data in its brief, which appellants have not disputed.

8

return to the Barret residence, unload boxes, and then return to the CMRAs to retrieve additional boxes.

Barret instructed Forrest and Constantine Branch to cut open the boxes and remove the marijuana, while asking Palmer to "burn" the address labels. Barret then left the residence and was arrested, along with a number of co-defendants. Immediately prior to his arrest, Barret called Kevin Lee, who was still at the residence, and told Lee to "[r]un, run, run." Following Barret's arrest, a New York Police Department SWAT team executed a search warrant at the Barret residence. The police also arrested Scarlett, Forrest and several others.

During their search of the residence, investigators discovered an open box, along with one bale of marijuana on the kitchen counter and another bale on the floor. Investigators also opened the remaining unopened parcels and found more bales of marijuana. The total weight of the marijuana recovered from the packages exceeded 95.7 kilograms.[5] Investigators recovered approximately 20.4 kilograms more of marijuana elsewhere in Barret's house. The investigators also recovered two guns, one in an adjacent backyard and one in the living room,

[5] Investigators also recovered additional incriminating evidence such as digital scales, vacuum sealing machines, rolls of vacuum sealing bags, a gun box, and two firearms.

9

along with fifty-seven cellular phones from the Barret residence and on the persons arrested. Data recovered from one of the phones revealed text messages referring to bank names, account holders' names, and account numbers. Based on information obtained from seized cell phones, Postal Inspector James Buthorn testified at trial that an individual named "Prezi"[6], a nickname for Barret's Arizona-based marijuana supplier, Clifton Williams, had used a cell phone to send Barret messages with account information so that Barret could pay Williams.

**II. The Indictment**

On December 29, 2011, a federal grand jury in the Eastern District of New York returned a six-count superseding indictment. Count One charged Barret with being the leader of a continuing criminal enterprise in violation of 21 U.S.C. § 848(a). Count Two charged Barret, Scarlett, and Mitchell with conspiring to distribute and possess with intent to distribute more than 1,000 kilograms of marijuana between November 2006 and November 2010, in violation of 21 U.S.C. § 846. Counts Three and Four charged Barret with maintaining a stash house and conspiring to maintain a stash house in violation of 21 U.S.C. §§ 856(a) and 846,

---

[6] The name appears as "Presi" in the government's appendix and is spelled both ways in the government's brief.

respectively. Count Five charged Barret and Scarlett with distribution and possession with intent to distribute at least 100 kilograms of marijuana on or about October 7, 2010, in violation of 21 U.S.C. § 841(a)(1). Count Six charged Barret, Scarlett, and Mitchell with possessing, brandishing and discharging firearms in furtherance of drug trafficking crimes, in violation of 18 U.S.C. § 924(c).

### III.    The Trial and the Admission of Forrest's Testimony

At trial, the government called nineteen witnesses, including four cooperators: Melbert Palmer, Clifton Williams, Leemax Neunie, and Kareem Forrest. Opening statements at trial began January 9, 2012, with Forrest as one of the co-defendants. The first four days of trial consisted primarily of testimony by the case agent, after which Forrest entered into proffer talks with the government. He entered into a cooperation agreement with the government and changed his plea from innocent to guilty on January 17, 2012.  That same day, the government advised the court and defense counsel of its intention to add Forrest to its witness list. As a result, the district court instructed the jury that:

> One co-defendant is no longer on trial, and you are not being asked, or you will not be asked to reach a verdict as to him. You are not to be concerned with that co-defendant, nor are you to speculate about the reasons why he is no longer part of this trial, and this fact should not affect or influence

your verdict with respect to the remaining defendants. You must base your verdict as to the remaining defendants solely on the basis of evidence, or lack of evidence, against each defendant.

Gov't App'x at 132.

Scarlett, Mitchell, and co-defendant Ryan Anderson objected and moved to exclude Forrest's testimony, arguing: (1) Forrest participated in defense strategy before entering into his cooperation agreement, enabling him to report on such strategies to the government in violation of his co-defendants' Sixth Amendment rights to counsel; (2) Forrest was present at trial for the testimony of the government's first witness, violating Rule 615 of the Federal Rules of Evidence which, appellants assert, requires the exclusion of witnesses from the courtroom; and (3) Forrest's testimony would likely refute assertions made during the defense's opening and arguments that were critical to the defense.

In a written opinion, the district court rejected each argument. *United States v. Barret, et al.*, No. 1:10-cr-809, slip op. at 1-14 (E.D.N.Y. Jan 21, 2012), *reprinted in* Gov't App'x at 278-291. First, it stated that there was no Sixth Amendment violation because there was no evidence that Forrest had been "planted" or sent to infiltrate the defense team. Rather, he approached the government on his own volition, and his testimony would be limited to events that occurred prior to any

12

meetings of defense counsel, eliminating any possible Sixth Amendment violation. The district court accepted the government's representation that Forrest did not "communicate[] anything to the government that would reveal the tactics or strategy of the defense." *Barret*, No. 1:10-cr-809, slip op. at 8-9, Gov't App'x at 283. Second, the district court determined that Forrest's presence in the courtroom during the testimony of the first government witness did not violate Rule 615 of the Federal Rules of Evidence. Rule 615 states that, upon a party's request, the court "must order witnesses excluded [from the courtroom] so that they cannot hear other witnesses' testimony" and that the court "may also *sua sponte* exclude witnesses from the courtroom . . ., [but] such exclusion is not otherwise required." *Barret*, No. 1:10-cr-809, slip op. at 8-9, Gov't App'x at 284-85.

The district court determined that Mitchell failed to cite any legal authority to support his claim that Forrest's testimony "should be excluded solely because he was present in the courtroom as a defendant during [witness] testimony." *Barret*, No. 1:10-cr-809, slip op. at 8, Gov't App'x at 285. Viewing the record as a whole, the district court was "unpersuaded that Mr. Forrest's presence in the courtroom during the first three days of trial constitute[d] valid grounds to exclude his testimony." *Id.*

Finally, the district court rejected Scarlett's argument that Forrest's testimony would cause unfair prejudice because it would refute assertions made during defense counsels' opening statements and the defendants' theories of defense. The court recognized that "when a codefendant switches sides and becomes a government witness, his testimony will likely help the government and harm the remaining defendant[s]." *Id.* (quoting *United States v. Pierro*, 32 F.3d 611, 617 n.5 (1st Cir. 1994), *abrogated on other grounds by United States v. Anonymous Defendant*, 629 F.3d 68 (1st Cir. 2010)). However, "[i]t is only *unfair* prejudice against which courts must guard." *Barret*, No. 1:10-cr-809, slip op. at 8-9, Gov't App'x at 285-86 (quoting *Pierro*, 32 F.3d at 617 n.5). In this case, the district court determined that there was no "'cognizable prejudice,' even though Mr. Forrest changed his plea and his testimony may 'knock[] the pins out from under [the common] defense' which he and his [original] co-defendants had initially asserted." *Id.* (quoting *Pierro*, 32 F.3d at 617).

The district court stated it would follow the guidance set forth by the Seventh Circuit in *United States v. Olson*, 450 F.3d 655 (7th Cir. 2006), that "the lower court's cautionary instructions [are] key to determining whether reversible

error occurred." Gov't App'x at 286 (citing *Olson*, 450 F.3d at 678). Consistent

with *Olson*, the district court instructed the jury:

> Ladies and gentlemen of the jury, you will hear testimony about Mr. Forrest's decision to enter into a guilty plea. You are not to draw any negative inferences against any of the remaining defendants whatsoever based on Mr. Forrest's decision to enter a guilty plea or to testify during this trial. The guilt of any person, including Mr. Forrest, is not evidence of the guilt of any other person; specifically, the remaining defendants on trial. You, as jurors, may give Mr. Forrest's testimony such weight that you feel it deserves keeping in mind that it must be considered with great caution and great care.

Gov't App'x at 249.

**IV.    The Admission of Mitchell's Statement**

As part of its case-in-chief, the government introduced a statement given by Mitchell after his arrest.  Mitchell was not with Barret or at the Barret residence during the October 7, 2010 raid, and thus was not arrested with Barrett and the other co-defendants. When Mitchell was arrested, however, he waived his *Miranda* rights and agreed to speak with investigators. Mitchell identified himself in photographs taken during surveillance of the Barret residence, and also identified others arrested on October 7, 2010, including Kwaume Wilson, Leemax Neunie, Kevin Lee, Melbert Palmer, Kerry Gunter, and Clifton Williams. Mitchell also stated he had seen someone named "Stewie" bring $9,000 to the

15

Barret residence to buy marijuana. He also told investigators that he observed boxes being brought to the Barret residence.

After the four-week jury trial, the jury returned a verdict on February 8, 2012, convicting Barret on all counts, Scarlett on the conspiracy to distribute and distribution counts, and Mitchell on the conspiracy to distribute count. The district court sentenced Barret primarily to 40 years' imprisonment: 33 years' imprisonment on Counts One through Five and a consecutive sentence of seven years' imprisonment on Count Six (the Section 924(c) firearms count). The district court sentenced Scarlett primarily to 150 months' imprisonment. And the district court sentenced Mitchell primarily to 130 months' imprisonment. This appeal followed.

## DISCUSSION

**I.     Admission of Forrest's Testimony.**

We review a district court's decision to admit testimony for abuse of discretion, "recogniz[ing] that district courts enjoy broad discretion over the admission of evidence." *United States v. McDermott*, 245 F.3d 133, 140 (2d Cir. 2001); *see also United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83, 87 (2d Cir. 1999) ("Evidentiary rulings are reversed only if they are manifestly erroneous,

16

such that the admission constitutes an abuse of discretion."(internal quotation marks omitted)). "A district court has abused its discretion if its ruling is based on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or if its decision cannot be located within the range of permissible decisions." *United States v. Cuti*, 720 F.3d 453, 457 (2d Cir. 2013).

The question of whether a district court may permit the testimony of co-defendants who change their pleas to guilty mid-trial and testify for the government is a question of first impression in our Circuit. We join our sister Circuits in holding that a district court may allow such testimony, but must take appropriate steps to avoid causing unfair prejudice to the remaining co-defendants. *See, e.g., United States v. Olson*, 450 F.3d 655, 677-78 (7th Cir. 2006) (holding that the district court did not abuse its discretion in permitting co-defendant to testify for the government after pleading guilty mid-trial where the court gave appropriate instructions to the jury); *United States v. Gambino*, 926 F.2d 1355, 1364 (3d Cir. 1991) (same); *see also United States v. Mejia*, 82 F.3d 1032, 1037-38 (11th Cir. 1996) ("A mistrial is not required where a codefendant changes his plea in the middle of a trial if the jury is properly instructed and if evidence of the plea is properly limited."), *overruled on other grounds by Bloate v. United States*,

17

559 U.S. 196 (2010); *Pierro*, 32 F.3d at 617-18 (stating that "[a]s a general matter, a mistrial is not automatically required when a codefendant changes his plea in mid-trial" and that "[t]hat principle obtains even when the newly pleaded defendant takes the witness stand and testifies against the remaining defendants").

We adopt the standard articulated by the Seventh Circuit in *Olson*, which guided the district court's approach below. *Olson* relied on the Seventh Circuit's decision in *United States v. Thomas*, 774 F.2d 807 (7th Cir. 1985), which noted that "it is well-recognized that the testimony of codefendants after negotiating a mid-trial plea bargain is admissible in certain instances for limited purposes." 774 F.2d at 809. In *Thomas*, as here, a co-defendant pleaded guilty mid-trial and then testified against the remaining co-defendants. *Id.* As the co-defendants did here, the remaining defendants objected on the grounds that (1) the co-defendant participated in pre-trial defense planning and thus was aware of privileged conversations and strategies; (2) the co-defendant was present at trial prior to his guilty plea, and his presence violated the witness exclusion rule; and (3) the testimony of a defendant-turned-government-witness was unfairly prejudicial to the remaining defendants. *Id.* The *Thomas* court rejected each of these arguments,

18

finding that absent a specific criticism by defendants as to "how the district judge's cautionary instruction was lacking," such testimony is generally permissible. *Id.* at 809-10. The *Thomas* court noted that "[t]here is no evidence any confidences from" the pre-trial strategy sessions with defense counsel "were revealed [by the former co-defendant] on the witness stand or that his testimony was formulated with any pretrial strategies of the defendants taken into account." *Id.* at 810. As to the alleged violation of Rule 615, the *Thomas* court found that the case law "reveals that absent any indication [that the former co-defendant's] presence in the courtroom was the product of government connivance (or in some way a willful violation of the rule) it is within the district court's sound discretion to allow the witness to testify." *Id.*

Similarly, in *Gambino,* the Third Circuit addressed whether a co-defendant who changed his plea to guilty on the twelfth day of a 26-day trial could testify for the government. 926 F.2d at 1364. The Third Circuit held that the district court's limiting instruction, given the day after the co-defendant was absent from the defense table, was sufficient to avoid the "possibility [of] prejudice" by "properly instruct[ing] the jury on the appropriate uses of guilty pleas." *Id.* The *Gambino* court noted that "as with the guilty pleas of the other co-conspirators,

19

[the former co-defendant's] guilty plea was not emphasized by the prosecutor during direct examination, and was not inappropriately emphasized during closing argument." *Id.* For these reasons, the appropriate uses of the witness's "plea were clear, and the district court's decision to admit [the] testimony and to allow mention of [the witness's] guilty plea was not an abuse of discretion." *Id.*

We agree that a co-defendant who turns government witness during trial may be permitted to testify at that trial, provided that the district court takes steps to avoid unfair prejudice. First, the district court must ensure that the testimony of the former co-defendant is admitted only for the limited purpose of testifying to events other than the witness's involvement in joint defense planning. This protects the remaining co-defendants from any prejudice that would arise from the former co-defendant's awareness of defense strategy, pre-trial conversations with co-defendants occurring after arrest, or privileged conversations with counsel.

Second, the district court must deliver adequate cautionary instructions to the jury to make certain that the jury does not draw any adverse or unfair inferences against the remaining co-defendants, does not use the former co-defendant's admission as guilt as evidence of the guilt of the remaining co-

20

defendants, and does not give the former co-defendant's testimony undue weight. We approve of the instructions given here by the district court.

Scarlett and Mitchell argue that the admission of Forrest's testimony violated their Sixth Amendment right to counsel. They cite to *Massiah v. United States*, 377 U.S. 201 (1964), where the Supreme Court made clear that the government cannot gain access to defense strategy by infiltrating the defense team via government informants who deliberately seek incriminating evidence that the prosecution will then use at trial. However, there is no evidence that the government infiltrated the defense team or deliberately elicited incriminating evidence. To the contrary, Forrest approached the government during the trial, and there is nothing in the record that contradicts the government's representation that Forrest did not share defense strategy, defense tactics, or any other confidences with the government.

We also agree with the district court that Forrest's presence in the courtroom during the testimony of the government's first witness, Postal Inspector James Buthorn, did not violate Rule 615. Rule 615 states that "[a]t a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony. Or the court may do so on its own." Fed. R. Evid. 615.

21

Scarlett and Mitchell argue that because Forrest heard Buthorn's testimony, along with defense counsel's opening statements and other arguments, Forrest could then tailor his own testimony accordingly. However, as the district court aptly observed, Rule 615 does not operate to bar testimony simply because a witness was present as a defendant during a prior witness's testimony. We agree with the Seventh Circuit that "absent any indication [Forrest's] presence in the courtroom was the product of government connivance (or in some way a willful violation of the rule) it is within the district court's sound discretion to allow the witness to testify." *Thomas*, 774 F.2d at 810. Scarlett and Mitchell identify no such connivance or willful violation, and we find no abuse of discretion in allowing Forrest to testify.

To the extent Forrest's testimony created a risk of unfair prejudice, the district court adequately mitigated that risk through its cautionary instructions to the jury. These instructions helped to ensure that the jurors (1) did not draw negative inferences against the remaining defendants; (2) did not use Forrest's guilty plea as any evidence of the guilt of the remaining co-defendants; and (3) gave Forrest's testimony the weight they felt it deserved, "keeping in mind that it

must be considered with caution and great care." *Barret*, No. 1:10-cr-809, slip op. at 9, Gov't App'x at 286 (citing *Olson*, 450 F.3d at 678).

**II.    Sufficiency of the Evidence.**

We next consider Mitchell's argument that the evidence was insufficient to convict him of conspiring to distribute and distribution of 1,000 kilograms or more of marijuana in violation of 21 U.S.C. §§ 841, 846. The drug quantity here played a key role in Mitchell's sentencing: Title 21 dictates a mandatory minimum sentence of 10 years' imprisonment if a defendant is found to have committed a crime involving more than 1,000 kilograms of marijuana. 21 U.S.C. § 841(b)(1)(A)(vii).

To affirm a conviction for conspiracy to distribute under Section 846, the record must support a rational jury's finding "(1) the existence of the conspiracy charged; (2) that the defendant had knowledge of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008) (citations omitted). As relevant here, a "[c]onviction of a Section 841(b)(1)(A) conspiracy also requires that a jury find, or the defendant himself admit to, the drug-quantity element. Additionally, we require proof that

this drug type and quantity were at least reasonably foreseeable to the co-conspirator defendant." *United States v. Adams*, 448 F.3d 492, 499 (2d Cir. 2006) (citation omitted); *see also Santos*, 541 F.3d at 70-71.

Where, as here, a defendant challenges a conviction based on the insufficiency of the evidence against him, we are required:

> to determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Put another way, a court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.

*United States v. Temple*, 447 F.3d 130, 136 (2d Cir. 2006) (citations and internal quotation marks omitted). This is a "heavy burden." *Id.* at 137. We must defer to the jury's determination of witness credibility, the weight of the evidence, and the reasonable inferences the jury draws from the evidence. *United States v. Morrison*, 153 F.3d 34, 49 (2d Cir. 1998). "In cases of conspiracy, deference to the jury's findings 'is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'"

24

*United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004) (quoting *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1992)).

Mitchell argues that the government's evidence demonstrated nothing more than the fact that Mitchell associated with Barret and other members of the Fatherless Crew, and that Mitchell spent time at Barret's house. He argues that the evidence did not demonstrate that he knew the full scope of the conspiracy, or that he could reasonably foresee that the criminal enterprise aimed to distribute in excess of 1,000 kilograms of marijuana. We disagree.

Here, the evidence permits a rational jury to find the existence of a conspiracy, that Mitchell had knowledge of the scope of the conspiracy, and that he intentionally joined the conspiracy. The government adduced evidence that Mitchell was a member of the Fatherless Crew, and that he called Barret "General" because Barret was "the boss for 'The Fatherless Crew.'" Gov't App'x at 139. Witnesses testified that Mitchell acted as a lookout when marijuana was scheduled to arrive at the stash house, that Barret took Mitchell on the road with him, and that Mitchell carried a gun to guard drugs stored at Barret's residence. Forrest testified about an instance in which he heard Barret telling Mitchell to stand in front of the house and watch out for police and robbers when marijuana

parcels were arriving.  In addition, the government introduced video surveillance showing Mitchell walking in front of the Barret residence on September 23, 2010 just before a vehicle arrived carrying boxes of marijuana. The video shows Mitchell and another person taking the boxes out of the vehicle. We conclude that the record evidence amply supports the jury's conclusion that Mitchell was a member of the conspiracy. Further, the government presented concrete evidence of the specific drug quantities involved, including evidence of the weight of the parcels tracked by investigators (approximately 403 kilograms) and evidence of the weight of the marijuana recovered following the October 7, 2010 raid (approximately 116 kilograms). Because the government showed that the Fatherless Crew received in excess of 376 kilograms[7] of marijuana during a roughly two-month period in the course of an almost four-year conspiracy, the jury had an ample basis to conclude that it was reasonably foreseeable to Mitchell that the Fatherless Crew (of which he was a member) conspired to distribute and distributed at least 1,000 kilograms of marijuana. *See United States v. Martinez*, 987 F.2d 920, 926 (2d Cir. 1993) (government required to show that

---

[7] The total weight received during the relevant period was calculated as the amount tendered less 17.51 kilograms of marijuana seized from three parcels in January 2010 and 10 kilograms of marijuana seized from one of ten parcels tendered on October 5, 2010.

defendant could reasonably foresee the type and quantity of illicit substance involved in the conspiracy).

While a closer question, the evidence is also sufficient to establish a link between the quantities of drugs proved and a basis for the jury to infer that Mitchell was aware, or could reasonably foresee, that the conspiracy involved at least those quantities of drugs. Drug conspiracies can involve large numbers of individuals, with many members playing minor roles. Indeed, leaders of drug conspiracies may intentionally compartmentalize their operations in an effort to ensure that individual members are unaware of other parts of the conspiracy as well as the full scope of the conspiracy's operations. For this reason, there may often be circumstances in which "bit" players in a conspiracy cannot reasonably foresee the full quantity of drugs involved in the conspiracy as a whole. Nevertheless, after a conviction we must view the evidence "in the light most favorable to the prosecution," *Temple*, 447 F.3d at 136. Here, the record establishes that the conspiracy was broad in scope, that Mitchell had a close relationship with his half-brother Barret, that Mitchell was personally involved with many members of the Fatherless Crew, and that over an extended period of time Mitchell both protected Barret and served as a lookout during drug

deliveries. On this record, a rational trier of fact could infer that Mitchell could have reasonably foreseen that the conspiracy involved in excess of 1,000 kilograms of marijuana. Thus, we affirm Mitchell's conviction and sentence.

## CONCLUSION

For the foregoing reasons, the judgments of the district court are AFFIRMED with respect to these challenges. Appellants' remaining arguments are addressed in the summary order issued simultaneously with this opinion.